UNITED STATES of America,
Plaintiff–Appellee,

v.

Bobby Lee McKINLEY, Defendant–
Appellant.

No. 95–1605.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1996.

Decided May 21, 1996.

Laura A. Przybylinski (argued), Office of U.S. Atty., Madison, WI, for plaintiff-appellee.

Christopher T. VanWagner (argued), Madison, WI, for defendant-appellant.

Before WOOD, Jr., CUDAHY, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

After the district court denied his motion to suppress, Bobby Lee McKinley entered a conditional plea of guilty to the charge of causing altered securities (thirty-five American Express money orders) to be transported in interstate commerce in violation of 18 U.S.C. §§ 2 & 2314. In sentencing McKinley to a prison term of eighty-seven months, the district court departed upward from the applicable range under the Sentencing Guidelines after finding that McKinley's criminal history category significantly under-represented his actual criminal history. As

further support for its departure, the court pointed to the fact that McKinley had repeatedly involved vulnerable juvenile females in his criminal endeavors. In this appeal, McKinley challenges the denial of his motion to suppress and the propriety of the upward departure at sentencing. We affirm.

## I.

### A.

After his indictment on the current charges, McKinley moved to suppress inculpatory statements he had made to FBI Special Agent Charles G. Southworth in the course of an interview at a Minnesota prison on July 13, 1994. A magistrate judge conducted a hearing on McKinley's motion and issued findings of fact and conclusions of law which were adopted by the district judge. The facts described here are largely undisputed and are based on the factual findings of the lower courts.

Early in 1994, Agent Southworth learned from local authorities that someone had cashed forged money orders in Eau Claire, Wisconsin. Southworth began investigating and learned that thirty-five American Express money orders had been cashed and that the face amount of each had been changed from $3.00 to $300.00. McKinley soon became a suspect, and Southworth learned that McKinley was then jailed in Tennessee on unrelated state charges. As a result, Southworth sent a communication to the FBI's office in Jackson, Tennessee, asking an agent there to attempt to contact McKinley. In late May or early June 1994, Agent Gary Boutwell called Southworth to report his findings.[1] Boutwell had learned that McKinley was being held on state forgery and impersonation charges relating to his use of a false credit card. At McKinley's arraignment on those charges, the Tennessee court had appointed Pam Drewery, a public defender, to represent him, and Boutwell had contacted Drewery on May 27, 1994. The agent first informed Drewery that the FBI was investigating McKinley in connection with altered money orders cashed in Wisconsin, and he asked Drewery for permission to interview McKinley. Drewery responded that at that time, she did not want her client interviewed by the FBI with regard to the encashment of altered money orders or any other matter. She told Boutwell, however, that she would inform him when her representation of McKinley ended.

Near the end of June or the beginning of July 1994, Boutwell called Southworth with an update. Boutwell reported that he had received a call from Drewery on the 21st or 22nd of June informing him that the Tennessee case had been adjudicated and that her representation of McKinley had ended. At about the same time, Boutwell also had received a call from McKinley himself, who expressed an interest in speaking with the agent. Southworth could not recall, however, whether Boutwell had been available when McKinley called or whether the agent had only received a message to that effect.[2] Boutwell finally told Southworth that McKinley had been transferred out of Tennessee and that Boutwell had been unable to speak with him before the transfer.

Southworth subsequently learned that McKinley had been transferred to a state prison in Stillwater, Minnesota. Southworth then called the Minnesota prison and spoke to Allan Kirschner, McKinley's case manager. The agent described the nature of his investigation and asked Kirschner to inquire whether McKinley would be willing to speak with him. McKinley apparently realized that he had no obligation to speak with Southworth, but he indicated to Kirschner that he knew of the FBI's investigation and that he would be willing to speak with the agent. Kirschner relayed this information to Southworth.

Southworth traveled to Stillwater to meet with McKinley on July 13, 1994.[3] McKinley

---

1. The conversation between Boutwell and South-worth was related through Southworth, as the government did not produce Agent Boutwell to testify at the suppression hearing.

2. Neither Boutwell nor Southworth prepared a written report of their second conversation, although Southworth had prepared a report after Boutwell's initial call.

3. Southworth had first investigated whether

was being held in the prison's segregation unit, which meant that he was confined to his cell except for occasional visits to the shower and the exercise yard. Under prison policy, segregation prisoners were handcuffed when transferred to or from those locations, although the cuffs would be removed upon arrival. If a segregation prisoner was required to leave his cell for any other reason, he would be cuffed the entire time. As a result, McKinley was handcuffed during his interview with Southworth on July 13. That interview took place in a large conference room furnished with a table and chairs. The conference room had windows to the outside and a window in the door. Kirschner attended the interview and was seated at the head of the table. McKinley was seated across from Southworth. Southworth never explicitly told McKinley that he was free to leave the conference room, although he indicated that if McKinley terminated the meeting, Southworth would leave. McKinley never asked to leave or to terminate the meeting, nor did he request any food or beverage.

The meeting between Southworth and McKinley lasted forty-six minutes, and Kirschner likened their exchange to a tennis match, with each attempting to achieve his own goals. After Southworth described for McKinley the evidence he had gathered, McKinley explained that he had heard much of this before. He told Southworth that deputies from a Minnesota sheriff's department had already confronted him at Stillwater, which had prompted McKinley to contact an attorney. Southworth asked whether McKinley was currently represented or whether he wanted an attorney present, and McKinley responded "no" to both queries. Southworth eventually advised McKinley of his *Miranda* rights and presented him with a preprinted waiver form. Southworth read the form to McKinley, who then appeared to read it himself. McKinley signed the form and then made incriminating statements about the Eau Claire money orders.

The district court refused to suppress these statements for three reasons. First, the court rejected McKinley's contention that charges were pending against McKinley in any other jurisdiction, and had found that no further

Drewery had invoked his right to counsel in all future discussions about the altered money orders when she informed Boutwell on May 27 that she did not want the FBI talking to McKinley about the altered money orders or any other matter. The court found that Drewery had only invoked McKinley's right to silence at that time. The court found, moreover, that even if Drewery's statement could be construed as a continuing invocation of the right to counsel, McKinley had subsequently waived that right when he called Boutwell and expressed an interest in speaking with him. In so finding, the court rejected McKinley's contention that the government's proof on this point was inadequate because it was based on double hearsay offered only through Southworth. Finally, the court found that the July 13 interview was not a custodial interrogation because McKinley had not been "in custody" for *Miranda* purposes.

McKinley now challenges each aspect of the district court's ruling. He first argues that the court erred in finding that his Tennessee attorney had never invoked his continuing right to counsel. The court then compounded that error, according to McKinley, by crediting uncorroborated double hearsay to find that McKinley had later initiated contact with the FBI. McKinley finally contends that he was "in custody" for *Miranda* purposes during the interview with Southworth at the Minnesota prison. We review the denial of McKinley's suppression motion for clear error. *See United States v. Banks,* 78 F.3d 1190, 1196 (7th Cir.1996). We address only the first of McKinley's three arguments in concluding that his motion to suppress was properly denied.

### B.

In *Miranda v. Arizona,* 384 U.S. 436, 469–73, 86 S.Ct. 1602, 1625–27, 16 L.Ed.2d 694 (1966), the Supreme Court held that before initiating custodial interrogation, police officers must advise a suspect of his right to consult with an attorney and to have counsel present during the interrogation. *See*

charges had been filed and that McKinley was not at the time represented by counsel.

*Davis v. United States*, —— U.S. ——, ——, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994). If a suspect invokes his right to counsel under *Miranda*, he is not subject to further interrogation until counsel is present or until the suspect himself initiates further discussions. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *see also McNeil v. Wisconsin*, 501 U.S. 171, 176–77, 111 S.Ct. 2204, 2207–09, 115 L.Ed.2d 158 (1991). This rule, moreover, is not offense-specific. Thus, if a suspect invokes his right to counsel during an interrogation addressed to one offense, he may not be reapproached and interrogated about that or a separate offense unless counsel is present, or unless the suspect himself initiated the subsequent dialogue. *See McNeil*, 501 U.S. at 177, 111 S.Ct. at 2208–09; *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). As the Court explained in *Roberson*, once counsel has been requested, a presumption arises that the suspect "considers himself unable to deal with the pressures of custodial interrogation without legal assistance," and that presumption "does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." 486 U.S. at 683, 108 S.Ct. at 2099.

McKinley's suppression argument is based at the outset on the contention that his Tennessee attorney invoked his right to counsel under *Miranda* during her May 27 conversation with Agent Boutwell. McKinley does not argue that he separately invoked that right in the course of his July 13 interview with Agent Southworth. Indeed, he signed a form waiving his *Miranda* rights during that interview and also told Southworth that he was not currently represented and that he did not wish to have counsel present. His inculpatory statements could only be suppressed, then, if McKinley had at some earlier point invoked his right to counsel and had

not subsequently waived that right by initiating a further uncounseled dialogue with the authorities.[4]

When asked by Boutwell in their May 27 conversation for permission to interview McKinley, Drewery responded that at that time, she did not want McKinley interviewed by the FBI about the encashment of altered money orders or any other matter. McKinley argues that Drewery's statement unambiguously invoked his right to counsel in connection with any further custodial interrogation. Yet the district court characterized Drewery's statement as only a temporary invocation of McKinley's right to silence which did not also serve to invoke his continuing right to counsel under *Miranda* and *Edwards*.

■■■■ Preliminarily, it is clear that McKinley's request for counsel at his arraignment in Tennessee did not serve also to invoke his *Miranda* right to counsel in connection with custodial interrogation addressed to an unrelated charge. The Supreme Court foreclosed such an argument in *McNeil v. Wisconsin, supra*, distinguishing a defendant's Sixth Amendment right to counsel in a pending criminal proceeding from the distinct *Miranda* right, derived from the Fifth Amendment, to have counsel present during custodial interrogation. 501 U.S. at 175–77, 111 S.Ct. at 2207–09. Once the Sixth Amendment right to counsel has attached and been invoked, a subsequent waiver in the course of a police-initiated custodial interview about the pending charge is ineffective. *Michigan v. Jackson*, 475 U.S. 625, 635, 106 S.Ct. 1404, 1410–11, 89 L.Ed.2d 631 (1986); *see also McNeil*, 501 U.S. at 175, 111 S.Ct. at 2207. In contrast to the *Miranda* right, however, the Sixth Amendment right to counsel is offense-specific, meaning that its invocation as to a pending offense would not preclude the police from interrogating a suspect about an unrelated offense. *McNeil*,

---

4. Our analysis assumes, of course, that the July 13 interview was a "custodial interrogation" and that Drewery's May 27 statement, if construed as a request for counsel under *Miranda*, was not premature. We need not decide either question to resolve McKinley's appeal, but neither is free from doubt in this circuit. *See, e.g., United States v. Menzer*, 29 F.3d 1223, 1230–32 (7th Cir.) (dis-

cussing whether interrogated suspect who is imprisoned on an unrelated charge is "in custody" for *Miranda* purposes), *cert. denied*, —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994); *United States v. LaGrone*, 43 F.3d 332, 339 (7th Cir.1994) (*Miranda* rights not validly invoked unless authorities are conducting custodial interrogation or custodial interrogation is imminent).

501 U.S. at 175–76, 111 S.Ct. at 2207–08; *Maine v. Moulton*, 474 U.S. 159, 179–80 & n. 16, 106 S.Ct. 477, 488–89 & n. 16, 88 L.Ed.2d 481 (1985). If the suspect also wished to have counsel present for that interrogation, he would have to separately invoke his right to· counsel under *Miranda*. In other words, the suspect's waiver of his *Miranda* rights in connection with that interrogation would˙not be nullified only because he had previously invoked his Sixth Amendment right to counsel in an unrelated proceeding. *McNeil*, 501 U.S. at 177–78, 111 S.Ct. at 2208–09; *see also Banks v. Hanks*, 41 F.3d 1187, 1189 (7th Cir.1994). As McNeil explained:

> To invoke the Sixth Amendment interest is, as a matter of *fact, not* to invoke the *Miranda–Edwards* interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution. It can be said, perhaps, that it is *likely* that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge.... But even if [that] were true, the *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*. The rule of that case applies only when the suspect "ha[s] *expressed*" his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*.

501 U.S. at 178, 111 S.Ct. at 2209 (quoting *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884–85) (emphasis in *McNeil*). Thus, although McKinley invoked his Sixth Amendment right to counsel in the Tennessee proceeding, he would have to separately invoke his *Miranda* right when interrogated about the Wisconsin money orders. *See United States v. Carpenter*, 963 F.2d 736, 739–40 (5th Cir.), *cert. denied*, 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). The question raised here, then, is whether Drewery's statement served that purpose, causing the *Edwards*

protections to attach and nullifying his subsequent·waiver in the July 13 interview.

■ In *Davis v. United States, supra,* a divided Supreme Court held that a suspect's invocation of his *Miranda* right to counsel must be unambiguous to be effective and that absent an unambiguous request, police officers need not cease their interrogation nor attempt to clarify whether the suspect in fact ·is invoking his *Miranda* rights. —— U.S. at ——–——, 114 S.Ct. at 2355–56. If the reference to counsel "is ambiguous or equivo-. cal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the request is ineffective, and the protections of *Edwards* do not yet apply. *Id.* at ——, 114 S.Ct. at 2355 (emphasis in *Davis).* In ascertaining whether a request for counsel was unambiguous under *Davis,* then, we apply an objective test. *Id.; see also Lord v. Duckworth,* 29 F.3d 1216, 1220 (7th Cir.1994).

■ If, instead of calling Drewery, Agent Boutwell had approached McKinley directly and asked to speak with him about the Wisconsin money orders, the analysis of his response under *Davis* would be more straightforward. Had McKinley responded as Drewery did—that he did not wish to speak with the agent while the Tennessee case was pending but that he would contact the agent when the case concluded—we would have no difficulty finding his response insufficient under *Davis* to invoke his *Miranda* right to counsel. Such a statement omits mention of a lawyer or legal counsel of any kind, and in that sense, a reasonable police officer would not have understood the statement to constitute a request for an attorney. *See, e.g., Kight v. Singletary,* 50 F.3d 1539, 1548 (11th Cir.1995) (suspect who said he did not want to talk to the officer did not invoke his right to counsel), *cert. denied,* —— U.S. ——, 116 S.Ct. 785, 133 L.Ed.2d 735 (1996).[5]

---

**5.** Indeed, courts have found that even where a suspect makes an equivocal statement about consulting an attorney, there has been no invocation of the right to counsel under *Davis. See Davis,* —— U.S. at ——, 114 S.Ct. at 2357 ("Maybe I should talk to a lawyer" not an unambiguous request); *Lord,* 29 F.3d at 1220–21 ("I can't

afford a lawyer but is there any way I can get one?" not an unambiguous request); *see also, e.g., Diaz v. Senkowski,* 76 F.3d 61, 65 (2d Cir. 1996) ("Do you think I need a lawyer?" not unambiguous); *United States v. Doe,* 60 F.3d 544, 546 (9th Cir.1995) (mother's statement that maybe the suspect should see a lawyer not unam-

But is that also true when the agent receives a similar response from the attorney appointed to represent the suspect in an unrelated case, or is the *Edwards* rule invoked in that circumstance by virtue of the attorney's involvement? Although an attorney statement is potentially more problematic, the attorney's involvement does not serve to automatically invoke McKinley's right to counsel under *Miranda,* for *McNeil* still requires that there be an expression of the suspect's wish "for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *McNeil,* 501 U.S. at 178, 111 S.Ct. at 2209. That "expression" may come from an attorney as well as from a suspect, but in the circumstances of this case, Drewery's statement was not, in our view, the "clear request" for counsel in connection with custodial interrogation that *Davis* requires. *See —* U.S. at —, 114 S.Ct. at 2356.[6] We do not believe that a reasonable law enforcement agent would interpret Drewery's statement to mean that McKinley could not be interviewed unless counsel were present, for that is not what she said. *See Carpenter,* 963 F.2d at 740 n. 3. It is more likely that a reasonable agent would interpret Drewery's statement exactly as Boutwell did—to mean that Drewery was invoking McKinley's right to silence while the Tennessee charges were pending, but that once that prosecution ended, her representation would cease, and the agent would be free to initiate a dialogue with McKinley. *Cf. United States v. La-Grone,* 43 F.3d 332, 337 (7th Cir.1994) (suspect's request to call his attorney after having been asked to sign a consent to search form was not also an invocation of the *Miranda* right to counsel for purposes of custodial interrogation). Indeed, by telling Agent Boutwell that she would notify him when her representation of McKinley concluded, Drewery contemplated precisely what occurred here.

■ In short, the district court's conclusion that Drewery's statement was a temporary invocation of McKinley's right to silence, and not an invocation of his *Miranda* right to counsel, was not clearly erroneous. *See Banks,* 78 F.3d at 1197. If McKinley also intended to invoke his right to counsel under *Miranda,* he was required to do so when subsequently interrogated by Agent Southworth. Because he did not at that point invoke his right to counsel, and because he specifically told Southworth that he did not want an attorney present, there was no violation of the *Miranda–Edwards* rule.[7] The motion to suppress was therefore properly denied.

## II.

■ McKinley also challenges the district court's upward departure from his Sentencing Guidelines range. The PSI set McKinley's offense level at 14 and his criminal history category at VI, which under the 1994 Guidelines provided for a sentencing range of between 37 and 46 months. Yet because McKinley had 40 criminal history points, 27 more than required to place him in the highest criminal history category, the district court found that category VI significantly underrepresented McKinley's actual criminal history. The court therefore added one offense level for every three of McKinley's criminal history points that exceeded 15.[8] This resulted in an eight-level departure and

---

biguous); *Flamer v. State of Delaware,* 68 F.3d 710, 725 (3d Cir.1995) (suspect's request to call his mother about possible representation not unambiguous), *cert. denied,* — U.S. —, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996).

6. Recall that McKinley did not himself direct Agent Boutwell to his attorney but that Boutwell contacted Drewery first of his own accord. Our discussion here is not intended to address the potentially distinct situation where a suspect directs a law enforcement agent to his attorney when asked for an interview.

7. Having concluded that McKinley did not clearly invoke his right to counsel under *Miranda,* we have no occasion to consider whether the gov-

ernment established through competent proof that McKinley then waived his rights by initiating contact with Agent Boutwell.

8. The sentencing table assigns a defendant to category VI if he has 13 or more criminal history points. Because the categories immediately preceding category VI apply to a three criminal history point range (*e.g.,* category V applies to a defendant with 10, 11, or 12 criminal history points), the court concluded that its departure should account only for those points exceeding 15.

provided McKinley with an offense level of 22.[9] The court explained that this departure was "further supported" by the fact that McKinley had "involved juvenile females in the offense conduct," an aggravating circumstance that was not, in the court's view, adequately taken into consideration by the Sentencing Commission. (Feb. 24, 1995 Tr. at 23.) We review the district court's departure "to ensure that the grounds ... were appropriate, that the factual findings underlying the departure were not clearly erroneous, and that the extent of the departure was reasonable" and sufficiently linked to the structure of the Guidelines. *United States v. Panadero*, 7 F.3d 691, 695 (7th Cir.1993) (internal quotation omitted); *see also United States v. Archambault*, 62 F.3d 995, 1000–01 (7th Cir.1995).

■■■ Guidelines § 4A1.3 authorizes a departure where the defendant's criminal history category significantly underrepresents the seriousness of his criminal history or the likelihood that he will commit further crimes. *See, e.g., United States v. Scott*, 914 F.2d 959, 965 (7th Cir.1990). We have previously approved upward departures in cases like this one where the defendant has accumulated criminal history points that far exceed the number required to place him in the highest criminal history category. *See United States v. Glas*, 957 F.2d 497 (7th Cir.1992) (39 criminal history points); *United States v. Lewis*, 954 F.2d 1386, 1397 (7th Cir.1992) (22 criminal history points). Section 4A1.3 instructs a court contemplating such a departure to "structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." *See also United*

States v. Ferra, 900 F.2d 1057, 1062 (7th Cir.1990).[10] That is what the district court did here, moving down eight levels, or one level for every three of McKinley's extra criminal history points. The district court's methodology was reasonable and sufficiently linked to the structure of the Guidelines. *See, e.g., Glas*, 957 F.2d at 499; *Scott*, 914 F.2d at 965; *United States v. Schmude*, 901 F.2d 555, 560 (7th Cir.1990); *Ferra*, 900 F.2d at 1062. Indeed, McKinley has not suggested otherwise.

[11] His only complaint about this aspect of the departure is that the district court failed to consider that he had served the maximum sentence on most of his former convictions. Even if true, however, that would not affect the court's ability to depart upward under the Guidelines based on his extensive criminal history. As the government points out, McKinley's argument proves only that the earlier periods of incarceration did little to deter him from further criminal activity. In that sense, the time McKinley served on the earlier convictions actually supports the departure here, as section 4A1.3 allows the court to consider "the likelihood that the defendant will commit other crimes." That is what the district court did, finding that McKinley's criminal history proved that he had not been deterred by his past convictions and that he was unlikely to be deterred in the future absent a departure and lengthier sentence. (Feb. 24, 1995 Tr. at 22.)

■■■ McKinley's only other objection to the departure relates to the observation below that it was "further supported" by the fact that McKinley had involved "vulnerable

---

9. The court then departed downward two levels to account for McKinley's substantial assistance to the government, giving him a total offense level of 20 and a sentencing range of 70 to 87 months. The court sentenced McKinley to an imprisonment term at the top of this range—87 months.

10. In *Glas*, the district court did not add offense levels but used hypothetical criminal history categories, determining the sentencing range applicable to each of the new categories it created. 957 F.2d at 498 & n. 3. We accepted that approach as reasonable because at the time,

" 'there [was] no Guideline procedure a judge [could] reference to help determine a proper degree of departure.' " *Id.* at 499 (quoting *United States* v. *Schmude*, 901 F.2d 555, 560 (7th Cir.1990)). In 1992, however, section 4A1.3 was amended to include the language quoted above, thereby clarifying that in departing above the highest criminal history category, a district court should move down the sentencing table to a higher offense level, rather than creating hypothetical criminal history categories. *See United States v. Dixon*, 71 F.3d 380, 383 (11th Cir.1995).

juvenile females" in his criminal conduct.[11] McKinley argues that the age and gender of his "accomplices" is not an appropriate basis for departure under the Guidelines, and because the district court based its departure in part on this factor, he believes his case must be remanded for resentencing.

There is no need for us to consider the propriety of such a departure under the Guidelines, however, because it is clear that the district court's concern did not serve to increase the extent of its departure. Before even mentioning McKinley's manipulation of juvenile females, the court determined to depart by eight offense levels based solely upon the 40 criminal history points McKinley had accumulated—a number the district court described as "massive." (*See id.* at 21, 23.) The court settled on eight levels, moreover, by adding one level for every three of McKinley's criminal history points that exceeded 15. Thus, the court specifically linked the extent of its departure to McKinley's criminal history points. Only after doing so did the court mention that the departure was "further supported" by McKinley's involvement with "vulnerable juvenile females." (*Id.* at 23.) Because that fact provided only "further support" for the departure and did not affect the extent of the departure, which the court had already calculated based on McKinley's criminal history points, we need not consider whether it is an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0.

AFFIRMED.

---

11. The district court was quite troubled by this aspect of McKinley's conduct, and understandably so. At one point in the sentencing hearing, the court observed:

> I am very concerned about your manipulative use of juveniles, females who are in vulnerable positions either because of their age or because they're addicted to drugs or they've run away from home or whatever. I think you have a real sense of who those people are and a real sense of how to take advantage of them to your own ends.

(*Id.* at 21.) The court mentioned this concern again in explaining its decision to sentence McKinley at the very top of the applicable range. (*Id.* at 23.)