United States v. Palmer                 CR-98-042-JD  07/24/98
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


United States of America

        v.                              Criminal No. 98-42-01-JD

Charles Palmer


                            O R D E R


     The defendant, Charles Palmer, is charged with conspiracy to

commit robbery and robbery in violation of 18 U.S.C. § 1951 and

§ 1952.  Before the court is the defendant's motion to suppress

statements (document no. 10).


                         Background[1]

     On March 20, 1998, the defendant was arrested by the Nashua

Police Department pursuant to an arrest warrant for robbery.

Detectives Andrew Lavoie, Christopher Peach, and Donald Campbell

conducted surveillance of 62A Pelham Road, Hudson, New Hampshire

to effect the defendant's arrest.  Detective Sprankle, hiding in

the outskirts of the house, made a positive identification of the

defendant through the window of the residence.  When police

support arrived, they knocked and were admitted to the residence.

_____

     [1]The facts discussed in this section represent the findings
of fact of the court from the hearing, the documents submitted,
and the tape recorded interview.

As the police approached, Sprankle observed the defendant flee to the basement. Sprankle pursued him there and placed him under arrest, handcuffing him behind his back.

Upon being informed that he was under arrest pursuant to a warrant for robberies, the defendant began shouting and yelling. In this tone he insisted that he had no connection to any robberies and contested the government's evidence. The defendant was told to shut up. He was removed and placed in the back of the police cruiser, hands still cuffed behind his back, with Sprankle by his side. Lavoie drove the cruiser to the Nashua Police Department.

In the car the defendant continued to shout and argue with Sprankle. Sprankle again told him to shut up. In response to the defendant's repeated assertions that the government had no evidence against him, Sprankle told the defendant that his co-conspirator had already divulged information regarding the defendant's role in the alleged robberies. Sprankle had to repeatedly tell the defendant to be quiet and to stop yelling and shouting. No Miranda warnings were given, although the defendant was not asked any questions at this point. Indeed, Sprankle advised the defendant not to say anything. Upon the defendant's insistence that he did not know anyone by the name of Talbot Curtin, his alleged co-conspirator, Sprankle informed him that he

2

would play tape recorded portions of Talbot's incriminating statements to the defendant.  Sprankle also told the defendant that his alleged co-conspirator was a child molester.[2]

Upon arriving at the Nashua Police Department the defendant was booked pursuant to standard operating procedures.  He was told by Sprankle only to respond to the booking officer's questions and to make no other statements.  The defendant was then led to an interview room with Lavoie and Sprankle.  The defendant was told that if he did not wish to talk, he did not have to, but that the police had incriminating statements from the alleged co-conspirator, which the defendant could listen to after he had been given his Miranda warnings.

At 7:43 p.m. the defendant was read his Miranda warnings by Sprankle from a printed Miranda waiver form.[3]  The defendant was

_____

[2]The record indicates that the defendant was a victim of child molestation himself, and that his alleged co-conspirator was living with the defendant, his girlfriend and her children. It is unclear at what point in time the child molester information was first relayed to the defendant.

[3]Before Sprankle read the defendant his Miranda rights, he asked the defendant if he had used any drugs or intoxicating liquor that day, which the defendant denied.  The defendant also denied this a second time at the beginning of his taped interrogation.  At the hearing, however, there was testimony from the defendant and his girlfriend that the defendant had already consumed two bags of heroin earlier that day.  His normal habitual consumption at this time was approximately five to seven bags a day.  The defendant had also taken Trazadone, an anti-

asked for his interpretation of each right, and responded accurately each time. Further, he was asked if he understood each right, and if so, after reading them to himself, to initial each written right. He did so, and stated that he understood his rights. Sprankle then read to the defendant the waiver portion of the _Miranda_ form and the defendant stated he understood the waiver. The defendant was then asked to read the waiver form himself, and if he understood it and wished to talk and waive his rights, to initial the waiver and sign the document. The defendant did so. This process was recounted during the taping of the defendant's confession. The defendant again acknowledged during his confession that he wished to waive his rights.

The officers then played selected portions of the co-conspirator's tapes which incriminated the defendant, implicating him in two robberies. The defendant became upset, asserting that his role in the robberies was minimal as compared to the co-

depressive medication for which the defendant had no prescription, earlier that day.

The defendant also asserts that he was "dope sick" at the time of the interrogation. "Dope sick" is the vernacular term used to describe the symptoms commonly experienced during heroine withdrawal. The defendant states that this ailment manifested itself in leg, stomach, and back aches, anxieties, and a shortened attention span. He claims that this caused him to want to leave the interrogation and lay down. However, the court notes that there were no signs of urgency evident in the taped interrogation.

4

conspirator's role. The defendant proceeded to relate his role in a number of other robberies and indicated his involvement in stealing from drug dealers in Lawrence, Massachusetts, by posing as a Federal Drug Enforcement Agent and other law enforcement officers. These statements were then recorded. The interview ended at 12:55 a.m. and the defendant was placed in detention.

During the taped portion of the interview the officers present were solicitous of the defendant. As the defendant had not eaten, the officers procured a submarine sandwich and tonic for him, which he consumed. The officers appeared to be professional and there was no indication that the officers were rude, abrasive, or forceful. Indeed, the taped portion of the interview indicates a very cooperative relation between the interrogating police and the defendant.

Discussion[4]

In Miranda v. Arizona, the Supreme Court established that prior to initiating custodial interrogation, police officers must advise a suspect that: (1) the suspect has a right to an attorney; (2) the suspect has a right to have the attorney present during interrogations; (3) an attorney will be provided

---

[4]This section contains additional findings of fact and the court's conclusions of law.

5

without cost if the suspect is indigent; (4) the suspect has a right to remain silent; and (5) anything that the suspect says can and will be used against the suspect.  See 384 U.S. 436, 469-73 (1966);  see also, United States v. McKinley, 84 F.3d 904 at 907 (7th Cir. 1996).  Once a suspect has invoked his right to counsel the police may not reinitiate interrogation until counsel is present or the suspect himself initiates further discussions. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); McKinley, 84 F.3d at 908.

A suspect may waive his Miranda rights, and where that waiver was made voluntarily, knowingly, and intelligently, the confessions obtained are admissible.  See Miranda, 384 U.S. at 444.  In reviewing the allegation that confessions were obtained through coercion or in violation of Miranda and its progeny, the court must ascertain "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Miller v. Fenton, 474 U.S. 104, 112 (1986).  It is the government's burden to prove by a preponderance of the evidence that the defendant's alleged confession was voluntary, knowing and intelligent. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  The court examines "the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might

6

cause his will easily to be overborne."  <u>United States v.</u>
<u>Rohrbach</u>, 813 F.2d 142, 144 (8th Cir. 1987).

The defendant seeks to suppress any statements obtained
during his custodial interrogation and asserts that his waiver of
rights was not knowing, intelligent, or voluntary because: (1)
his mental faculties were diminished during his detention; (2) he
asserted his right to remain silent and requested an attorney;
(3) the police told him he did not need an attorney; and (4) the
police coerced him into talking by warning of the consequences of
not talking, by referring to potential leniency if he cooperated,
and by indicating their need for his statements to protect
children from his co-conspirator's dangerous proclivity for
children.  The court addresses these arguments <u>seriatim</u>.

The defendant points to a number of factors that he asserts
contributed to his lack of mental agility on the day of his
arrest.  First, he claims that had taken heroine earlier that day
and had taken Trazadone as well.  However, the defendant himself
undermines this argument.  At the time of the taped interrogation
he denied being under the influence of drugs or liquor.  He said
that he had not used any heroine earlier that day.  At the
hearing he testified that on the night of his arrest:  (1) his
mind was working intelligently; and (2) he understood his <u>Miranda</u>

7

rights and his waiver of them.[5]  The defendant's mental clarity on the pertinent night is also corroborated by other evidence. Sprankle's impression was that the defendant was clearheaded.  In the tape recording of the confession the defendant sounded clearheaded; he agreed that he was clearheaded; he answered questions appropriately and coherently; he had very detailed recall of past events; and he did not slur or mumble.  The court therefore finds the defendant's contention that he lacked mental acuity to be unpersuasive.

The defendant next asserts that he requested an attorney twice.  Initially, just prior to recording his confession but after he had been given his Miranda warnings, the defendant alleges that he stated he thought he "should have an attorney present for this part."  After Sprankle allegedly told him there was no time for an attorney, the defendant requested an attorney a second time.  Instead of ceasing the interrogation, the defendant asserts that Sprankle proceeded with the questioning. Sprankle denies that there was ever a request for an attorney.

Once a request has been made for an attorney and the

_____

[5]Indeed, during the hearing it was evident that the defendant had knowledge of the significance of his Miranda rights and of his waiver.  He explained that although he had been arrested 16 times previously, not all of the arrests required Miranda warnings as he wasn't questioned every time.

8

defendant has asserted his Fifth Amendment rights, police interrogation must cease. See Edwards, 451 U.S. at 484-85. However, the court finds that the defendant did not request an attorney as he claims. Sprankle's demeanor during the trial was straightforward; he admitted to lying to the defendant and telling the defendant to shut up. Both the defendant and Sprankle attest to a series of events wherein Sprankle consistently deferred to the defendant's Constitutional rights. He repeatedly told the defendant not to speak until after he had been given his Miranda rights. The defendant was read his rights and was asked if he understood them. He was asked to give his interpretations of them. He was asked to read them from the waiver form. A similar process was followed concerning the defendant's waiver. Sprankle's demeanor, his candidness before the court, and his actions on the night of the defendant's arrest support the court's finding that no request was ever made for an attorney.

Finally, the defendant alleges that promises of leniency, threats "of consequences," and the asserted concern that a child molester would otherwise go free were all used to coerce the defendant into waiving his rights. The court finds no evidence in the record, not even testimony by the defendant, that promises

9

of leniency were made.[6]  Nonetheless, even if promises of leniency

had been made, it is doubtful that that alone would render the

defendant's confessions coerced and involuntary.  As the First

Circuit explained in United States v. Byram:

> [A]t common law, confessions produced by promises
> not to prosecute or offers of leniency were often
> excluded as involuntary. . . .
>
> However, in recent years, the Supreme Court has
> confined the voluntariness concept by holding that only
> confession procured by coercive tactics should be
> excluded as involuntary.

No. 97-2273, 1998 WL 244743, at *3, 4 (1st Cir. May 20, 1998)

(citations omitted) ("Given the narrowed definition of coercion

in [Colorado v. Connelly, 479 U.S. at 167], it would be very hard

to treat as coercion a false assurance to a suspect that he was

not in danger of prosecution.").

The court finds the defendant's assertion that he was

coerced by threats to be without merit.  The court finds no

evidence that the defendant was threatened with "the

consequences" of failing to speak.[7]  Def.'s Mot. to Suppress at 1.

---

[6]Statements that "[the co-conspirator] is the one [the
police] really wanted" and that the defendant was a low priority
in comparison do not rise to the level of a promise of leniency.

[7]There is testimony indicating Sprankle said that if the FBI
were controlling the case the defendant "would [be] doing life
without parole" and that the defendant was off the "guidelines"
chart.  Such a comment does give rise to an inference that it is
in the defendant's best interest to cooperate with the local

10

Additionally, the court finds that the child molester ploy was not used as a coercive element beyond targeting the general disrepute of child molesters in trying to associate the defendant with the police rather than with his co-conspirator. Moreover, the court finds that the information was neither relayed to nor perceived as creating a sense of urgency such that the defendant felt compelled to divulge his confessions lest a child molester be free to harm other children. Cf. Rhode Island v. Innis, 446 U.S. 291 (1980) (discussing interrogation).

Where, as here, the defendant was a victim of child molestation and the police used such a ploy to associate themselves with the defendant, the issue may play a role in determining whether the will of the defendant was overcome. This issue is augmented by the fact that the defendant functioned as a surrogate parent to the children of his girlfriend. Under the circumstances of this case, where the ploy was only used to

police. In certain circumstances it could also be a threat of harsher punishment for failure to cooperate. However, there is no evidence that the police had suggested a transfer of the case to the FBI if the defendant failed to cooperate. The court finds that this comment does not rise to the level of a threat of harsher punishment if the defendant refused to cede his Constitutional rights. In any event, it was not so coercive as to render the defendant's confession involuntary and his will overborne. Cf. Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (threatening to take a suspect's child away from her for failing to cooperate).

11

stigmatize the co-conspirator, the court finds that the ploy did not negate the voluntariness of the defendant's confession. Moreover, the fact that Sprankle was unaware of the defendant's past victimization indicates that the ploy was unlikely to have been used for such purposes.[8]

A last issue is raised by the fact that the police were deceptive in stating that the co-conspirator was a child molester. Although deception and trickery by the government are relevant to the court's inquiry, see, e.g., Byram, No. 97-2273, 1998 WL 244743 at *4, in this case the deception was of such a nature that the court finds it did not overwhelm the defendant's will. See id. Indeed, it would be hard to say that this confession was "procured by deceits." See id.

---

[8]The court finds significant the defendant's admission during the taped interrogation that no threats or promises were made to him:

> Sprankle: Have any promises or threats been made to you to give us this statement that you just gave us . . .
>
> Palmer: No, No.
>
> Sprankle: indicating all the information toward you and Talbot?
>
> Palmer: No.

Audio tape of interrogation of Charles Palmer, March 20, 1998, on file in United States v. Palmer, No. 98-42-01-JD (D.N.H. June 5, 1998).

12

### Conclusion

The court finds that under the totality of the circumstances the defendant's confession was voluntary, knowing and intelligent.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444.  The defendant's motion to suppress is therefore denied (document no. 10).

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

July 24, 1998

cc:  Sven D. Wiberg, Esquire
     Gary V. Milano, Esquire

13