In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3052

United States of America,

Plaintiff-Appellee,

v.

Thomas Walker,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 776--William J. Hibbler, Judge.

Argued February 16, 2001--Decided November 9, 2001

   Before Easterbrook, Manion, and Diane P.
Wood, Circuit Judges.

   Diane P. Wood, Circuit Judge.  After
robbing a Chicago bank, Thomas Walker was
caught when his two accomplices pointed
the police in his direction. While
suffering from heroin withdrawal, he
confessed to his crime, and was later
indicted, tried, and convicted. He now
asserts that the district court
erroneously rejected his motion to
suppress the confession and made a
variety of trial errors. While we are not
prepared to say that this was a flawless
proceeding, a combination of the required
standards of review and the harmless
error rule, taken in the context of the
powerful case against Walker, leads us to
affirm the judgment of the district
court.

I

   Walker was known around his neighborhood
as "Charlie Brown." In October 1999, he
approached his friend and later co-
defendant, Keith Johnson, and suggested
that the two should rob a bank. Keith
Johnson agreed, and they decided to rob
the TCF National Bank at 3333 W. 26th
Street in Chicago on October 8, 1999.
Keith Johnson in turn enlisted the help
of Willie McLaurin to serve as their
driver; McLaurin agreed, and borrowed a

blue Dodge Intrepid from his cousin, Kenya Banks, for the job. As the three were proceeding toward the bank, Walker had McLaurin detour so that Walker could pick up a black bag and purchase some heroin. Walker used the heroin as they continued on to the bank. At about 4:30 p.m., Walker entered the bank, drew his gun and ordered everyone to the floor. He then jumped over the counter, emptied two counter drawers, and ordered a teller, at gunpoint, to open a vault. Keith Johnson, also armed, stood guard in the bank lobby. McLaurin stayed in the car. The three fled with about $21,400.

Based on the license plate number provided to officers by a bystander outside the bank, officers traced the getaway car to Banks, and then to McLaurin, who was arrested on October 13. McLaurin talked, providing detailed information about the involvement of two individuals he knew as "Keith" and "Charlie Brown." The officers then showed photographs of Keith Johnson and Thomas Walker to McLaurin, and he identified them as the individuals who robbed the bank. Officers next arrested Keith Johnson, who corroborated McLaurin's story of the robbery and pointed to Thomas Walker as the other robber.

Chicago Police Department (CPD) officers arrested Walker at about 4:00 p.m. on October 19 and held him overnight. When he woke up the next morning, he was sick with diarrhea, vomiting, and stomach pain, and at about 9:00 that morning, he was taken to the hospital emergency room. The doctor there diagnosed him as suffering from heroin withdrawal and gave him an intravenous treatment of morphine and other medications. At 11:05 a.m., the doctor discharged him and returned him to the custody of the CPD, writing on the discharge form that Walker's condition was "good." The doctor later testified that at the time of Walker's departure, Walker was "alert and oriented," and that he was "with the program."

Upon his release, the CPD transported Walker to the FBI headquarters. FBI Agents Daniel Spotts and Nanette Skopelja took custody of him at about 12:45 p.m., read him his Miranda rights, and began an interrogation. Walker was still obviously ill at this time; not only had he vomited in the car on the way to the FBI offices,

he also vomited three times during the brief interrogation, and Agent Spotts gave him a plastic bag to use. After an ambiguous exchange about Walker's desire for a lawyer, Walker eventually signed a Federal Advice of Rights form waiving his right to remain silent and confessed both orally and in writing. Agent Spotts prepared a handwritten summary of Walker's statements, which included the following facts: (1) McLaurin drove Walker and Keith Johnson to the TCF bank on October 8; (2) once inside the bank, Walker vaulted the counter, took cash from a teller and placed it inside a blue book bag; (3) after robbing the bank, Keith Johnson and Walker were driven to another location where they split the money; and (4) Walker spent his share of the money on gambling, clothes, and heroin. Walker also viewed surveillance photos from the bank and identified one of the robbers as Keith Johnson and then, with regard to another robber in the photo whose face was blocked, he stated that it "could have been me." Walker also looked at a lineup and identified McLaurin as the person who drove him to and from the bank.

After Agent Spotts drafted the written statement, he read it to Walker, who signed it. Walker was then taken for an initial appearance before the magistrate judge; from there, he was moved to the Metropolitan Correctional Center (MCC). Upon a visit to the MCC clinic at about 7:00 that night, he was again diagnosed with heroin withdrawal and given some painkillers.

Walker, Keith Johnson, and McLaurin were charged with conspiracy to commit bank robbery and aggravated bank robbery, in violation of 18 U.S.C. sec. 371 and 18 U.S.C. sec.sec. 2113(a) and (d). Walker and Keith Johnson were also charged with use of a firearm in connection with a violent crime, in violation of 18 U.S.C. sec. 924(c)(1). Keith Johnson and McLaurin entered into plea agreements with thegovernment, while Walker went to trial.

Prior to trial, Walker moved to suppress his confession because it was made involuntarily and in violation of his rights to remain silent and to have a lawyer present. The court held a three-day suppression hearing but ultimately

denied the motion to suppress. It also denied Walker's motion to compel production of Agent Spotts's notes of his interview with Walker, finding that the notes were cumulative of the FBI report, which had already been produced.

At trial, both Keith Johnson and McLaurin testified against Walker, and the government used Walker's own confession. Walker's defense theory was that there were only two people involved in the robbery, or, if there were three people involved, he was not one of them. In order to support this defense, he called Andre Maurice Johnson (no relation to co-conspirator Keith), who had recently been incarcerated on separate drug charges, to testify that he had been with Walker at the time of the robbery. The jury was not convinced by his alibi, and after a three-day trial it convicted Walker on the conspiracy and aggravated robbery charges and acquitted him on the firearm charge. His motions for a judgment of acquittal and a new trial were denied, and he was sentenced to 276 months' imprisonment.

II

A. Confession

For understandable reasons, the argument Walker has emphasized on appeal concerns the admission of his confession. "The ultimate question of whether a confession is voluntary is a matter of law that must be reviewed de novo in this court." United States v. Jordan, 223 F.3d 676, 683 (7th Cir. 2000). Nonetheless, we review the court's factual findings only for clear error, id., especially when the suppression decision turned on the credibility of the witnesses. See United States v. Withers, 972 F.2d 837, 841 (7th Cir. 1992). The same standard applies to a district court's consideration of whether a waiver of Miranda rights was voluntary, see United States v. Combs, 222 F.3d 353, 362 (7th Cir. 2000), and whether a defendant invoked his right to counsel, see United States v. McKinley, 84 F.3d 904, 910 (7th Cir. 1996).

1. Voluntariness

Walker argues that his confession was involuntary because he was under the

duress of physical pain resulting from his heroin withdrawal. Additionally (and perhaps in the context of this physical distress), he claims that he confessed only after Agent Spotts promised him the use of a restroom, a visit with his children, medical care, and leniency from the judge.

Credibility determinations by the district court doom the latter set of claims. With regard to the use of the bathroom, Agent Spotts denied that Walker ever asked to use the bathroom, and the district court judge believed the agent. With respect to medical care and visits with the children, Agent Spotts testified that Walker never asked for either of these. In his denial of the suppression motion, the district court judge did not explicitly refer to the claims of promises regarding medical care and visits with Walker's children. The judge did make it clear, however, that he had found Walker utterly lacking in credibility, and that he was adopting Agent Spotts's version of these events. This is enough, though perhaps barely so, to encompass the medical care and child visitation issues as well. We note also that it strains belief to think that Walker would have been told that he could receive medical care only if he signed the confession, in light of the fact that the authorities had already made medical treatment available to him with no such strings attached.

With regard to promises of leniency, Agent Spotts admitted that he "explained to [Walker] that his cooperation, his truthfulness, his honesty and forthrightness in explaining to us what his role was in that bank robbery would in my experience go a long way toward helping him in front of the judge in this case." Spotts also admitted to telling Walker that although the "right to silence is an absolute, based on my experience, if they are cooperative with us, if I give them a chance to tell their side of the story, be cooperative and be completely honest, somewhere down the line that is reflected in court." We have consistently held that promises to bring the defendant's cooperation to the attention of the prosecutor do not render a confession involuntary. See United States v. Westbrook, 125 F.3d 996, 1005 (7th Cir. 1997); United States v.

Rutledge, 900 F.2d 1127, 1130 (7th Cir. 1990).

That leaves Walker's physical condition, which is certainly the most important point he raises. It is clear that Walker was in physical pain (not many people find vomiting too comfortable). But whether the physical pain was so acute as to make his confession involuntary depends on the underlying facts of the situation. The district court chose to believe the testimony of the emergency room physician, who said that when Walker left the hospital, he was "alert and oriented" and "with the program." His condition was noted as "good" on the discharge form. The court also credited the testimony of Agent Spotts, who reported that during the interview and the lineups, "[Walker] seemed to be in a clear state of mind and coherent in his thinking." Agent Spotts also testified that Walker never complained about feeling ill and never asked for medical assistance. Finally, the booking agent at the MCC testified that the defendant had enough composure and understanding to complete his medical history form and answer questions at the prison later that day. The factual background against which we make our determination of voluntariness is thus one in which Walker was in command of himself, albeit suffering from some physical discomfort. The latter is not enough, on this record, to render his confession involuntary.

Nonetheless, it does seem to us that the government could have handled this in a way that would have obviated the need for such fine line drawing. It offers no reason why it could not have waited the 24 to 48 hours that, according to the physician, it would have taken for Walker to be through the most painful hours of withdrawal. There could be a case in which a suspect's vulnerable physical condition rendered anything he said involuntary. The key point here, however, is that a suspect's physical pain or drug use does not make a confession involuntary as a matter of law. See United States v. Schwensow, 151 F.3d 650, 659 (7th Cir. 1998). The district court's finding that Walker was able to make a coherent decision to confess voluntarily was not clearly erroneous; we therefore uphold the finding of voluntariness.

## 2. Waiver of Miranda rights

At the suppression hearing, Agent Spotts testified that, prior to beginning the interview, he read Walker his Miranda rights from a Federal Advice of Rights Form 395 and told Walker that if he understood his rights he should sign the form. The form describes the well-known rights of the suspect to remain silent, to have a lawyer, and so forth, and it concludes with a "Waiver of Rights" statement that reads, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." After Agent Spotts read the form to him, Walker signed it.

Walker admitted for purposes of the suppression hearing that Agent Spotts read the description of his rights from the form, but he claimed that he did not understand them. Walker claimed that, if he did sign the form, he thought he was only acknowledging that his rights had been read to him--he did not know he was waiving his rights to a lawyer or to remain silent. Walker also admitted that he knows what his rights are, that he is very familiar with them, and that he has been read his rights many times by law enforcement officers. The district court judge rejected Walker's story, finding that Walker, with his prior history of arrests and his tenth grade education, knew how to read and knew what he was signing. And, as already discussed, the district court weighed the medical evidence of all the witnesses and concluded that Walker's physical condition did not preclude him from making a voluntary waiver of his Miranda rights. This determination was not clearly erroneous.

## 3. Invocation of Right to Counsel

Agent Spotts testified that as he was reading Walker his rights, Walker told him that "he wasn't sure whether he should talk to [Agent Spotts] because he was afraid it would piss his lawyer off." After Walker made this comment, Agent Spotts left the interview room for about 30 minutes in order to confer with his supervisor and a legal advisor as to whether he was required to stop the questioning; he was advised to continue.

Agent Spotts testified that upon returning to the interview room, he told Walker that he had two choices: Walker "could either talk to me, be cooperative, give us the truth in his view as to what, his involvement in the bank robbery or he could specifically ask for an attorney and I told him that if he does ask me for an attorney that this interview would have been terminated and no further questions would have been asked." Walker then told Spotts to "go ahead."

Of course, Walker remembers the events differently. He admits that Agent Spotts left for 30 minutes, but he claims that he had explicitly told the officer that he wanted to talk to a lawyer and even gave him the name of a lawyer who was then representing him in a state court criminal proceeding. Walker claims that Agent Spotts then said, "You don't have a lawyer. You can't afford a lawyer," and continued with the interrogation. Walker claims that he asked for his lawyer at least one more time and was ignored.

The district court believed Agent Spotts's version of the events, and we have no basis on which we could upset such a credibility determination. Accepting Agent Spotts's version of the events, we do not find Walker's reference to counsel to be an unambiguous or unequivocal request for a lawyer that a reasonable officer in light of the circumstances would have understood as such. See Davis v. United States, 512 U.S. 452, 458-59 (1994); United States v. Muhammad, 120 F.3d 688, 698 (7th Cir. 1997); McKinley, 84 F.3d at 909. Indeed, Agent Spotts properly gave Walker the opportunity to clarify his comment about counsel. Yet rather than clarifying that he was explicitly asking for a lawyer, Walker instead told Agent Spotts to "go ahead" with the questioning. For all these reasons, the district court did not err in denying Walker's motion to suppress his statement to the FBI or in allowing it to be used against him at trial.

B.  Prosecutor's Closing Statements

In the closing statements, defense counsel implied that Agent Spotts was lying when he testified about the defendant's confession and that Agent Spotts should not be believed. The prosecutor

therefore responded in his closing rebuttal statement that "if you are to believe what [defense counsel] said, you would have to believe that Agent Spotts was lying, that he didn't take this confession from the defendant." Walker argues that this statement distorted the burden of proof because it told the jury that in order to acquit the defendant, the jury had to believe that Agent Spotts had lied.

If the prosecutor had indeed made such a statement, it would probably be improper, see United States v. Vargas, 583 F.2d 380, 386-87 (7th Cir. 1978) (statements "that in effect distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict" may constitute grounds for reversal). But Walker has subtly changed the gist of the prosecutor's statement. In fact, rather than telling the jury that in order to acquit it had to believe that Agent Spotts had lied, the prosecutor simply repeated the defendant's version of the facts--that Spotts was not to be believed. This was a fair response to defense counsel's argument.

Walker also complains about the prosecutor's statements in closing that the defendant "told" the jury that McLaurin and Keith Johnson were telling the truth when they testified against Walker at trial:

[H]ow do you know that [Keith Johnson and McLaurin] were telling the truth? You know because the defendant told you that. He told you that in his confession, in his statement to Agent Spotts when he was interviewed. The defendant told you that he committed the robbery . . . . That's how you know that what Willie McLaurin and Keith Johnson told you was the truth. He confessed to it.

Walker made no objection to this statement at trial, and so our review is for plain error only. United States v. Olano, 507 U.S. 725, 732-35 (1993). Walker argues that the remark implied that because the defendant did not testify at trial, the jury was required to trust the version of events offered by Agent Spotts, McLaurin, and Keith Johnson. Walker argues that this was an impermissible commentary on the

defendant's failure to take the stand. But it is clear that it was not the prosecutor's "manifest intention" to refer to the defendant's silence; nor was the remark of "such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." See United States v. Ashford, 924 F.2d 1416, 1425 (7th Cir. 1991), quoting United States v. Perez, 870 F.2d 1222, 1229 (7th Cir. 1989). The prosecutor was merely commenting that the version of the events given by McLaurin and Keith Johnson was consistent with the version given by Walker to Agent Spotts. The prosecutor's comments did not violate any rule, much less plainly so.

## C.  Evidentiary Decisions

Walker also challenges several of the district court's evidentiary decisions, which we review for abuse of discretion, see United States v. Curry, 79 F.3d 1489, 1494 (7th Cir. 1996), except where the objections were not made at trial, in which case we review only for plain error. Olano, 507 U.S. at 736.

### 1. Testimony and Physical Restraint of Andre Maurice Johnson

First, Walker complains about the government's use of physical restraints on his alibi witness, Andre Maurice Johnson. Andre Johnson, who at the time of trial was incarcerated at Vandalia Correctional Center, was brought into the courtroom in the presence of the jury in handcuffs and leg shackles, and was accompanied by armed uniformed guards. Although the handcuffs were removed during his testimony, the leg chains remained. In contrast, government witnesses Keith Johnson and McLaurin, who were also incarcerated at the time, were not handcuffed or shackled when they testified. They were accompanied only by marshals in business suits. Walker argues that this treatment of Andre Johnson was highly prejudicial to his case.

The defense did not object to this treatment of Andre Johnson during trial, so we review only for plain error. Olano, 507 U.S. at 736. Defense counsel explains that he did not object because to do so would have just drawn more attention to the shackles, but this is no excuse for

the omission. The proper response is to call for a sidebar and make this kind of sensitive objection outside the view and hearing of the jury. There is thus no justification for the lack of an objection that would take this out of the scope of the plain error rule.

The first question is whether there was error at all; if so, we must then consider whether it was so fundamental that it requires reversal. We are troubled by the way that Andre Johnson was treated. As a general rule, criminal defendants are entitled to have their witnesses appear before the jury without physical restraints. See Harrell v. Israel, 672 F.2d 632, 635 (7th Cir. 1982). "Because of the potential for prejudice, this court has required a showing of 'extreme need' to justify the use of physical restraints at trial." Id. at 635-36. Here, though, Walker never objected, and so the prosecutor never had any occasion to address the question whether the physical restraints were necessary because Andre Johnson was either violent or an escape risk. The government's appellate brief is also silent on this point, although we understand that the lack of an opportunity to make a record hampers any such effort. It is not proper to shackle simply because a witness is an inmate at a maximum security prison. See United States v. Esquer, 459 F.2d 431, 433 (7th Cir. 1972). It seems to us quite possible that the use of the shackles was error, although we cannot be certain without a proper factual basis.

Assuming for the sake of argument that it was error, we turn to the question whether the error was "plain." We find that it was not. First, we note that the defendant's failure to raise an objection at trial prevented the district court from considering lesser alternatives. See Harrell, 672 F.2d at 637-38. Second, while restraints can affect a witness's credibility, Andre Johnson had already fatally undermined his own credibility. He contradicted his prior testimony as well as earlier statements he had made to the government. He admitted that he was a drug dealer and kept a shotgun to protect himself. Finally, his shackles were not visible to the jury while he testified.

2.  Rule 404(b) Evidence

   Walker also claims that some of the testimony elicited from the government's witness, Keith Johnson, was evidence of Walker's bad character that was impermissible under Federal Rule of Evidence 404(b). During his direct testimony, Keith Johnson testified that, on the date of the robbery, he was with Walker "off and on" all day, separating only for about 30 minutes at a time. He had earlier told investigators that he actually was not with Walker at about 4:30 p.m. This apparent inconsistency prompted the prosecutor to explore the alibi further in her cross-examination of Keith Johnson:

Q: Now, beginning that day, before we get to the afternoon, did you and Charlie do anything together?

A: Yes, ma'am. Every morning we do our little old thing together, you know?

Q: What's your little old thing that you do together?

A: You know, we go out, we get us some money together, you know.

Q: You get some money together?

A: Yes, ma'am.

Q: How do you get that money together?

   At this time, the defense counsel objected, knowing that Keith Johnson was about to talk about the drug dealing operation he had with Walker. But the district court allowed the questioning to continue, stating that "based upon the witness's testimony as to being with the defendant off and on, I believe that a party is allowed to establish the basis of how he knows that they were together, what times they were together, and what activity they did." The cross-examination went on, and the government elicited the following information: (1) on October 8, Keith Johnson and Walker were selling drugs, as they did every day; (2) they sold drugs in two different areas; (3) on the same day, Walker had "workers" at the spot where he habitually sold drugs; (4) Keith Johnson did not know where "Charlie" was at 4:30 in the afternoon because Keith Johnson had no watch.

This evidence was properly used to attack Walker's alibi and related only to the events on October 8. Once defense counsel puts an alibi witness on the stand, the prosecutor is allowed to try to establish exactly what the defendant and the alibi witness were doing that day and when they were doing it. See United States v. Cavale, 688 F.2d 1098, 1112 (7th Cir. 1982) (when a party opens up a subject, he cannot complain on appeal if opposing party introduces evidence on that subject). Even though it may have reflected poorly on Walker's character, its admission did not violate Rule 404(b) because it was used to refute the alibi, not to show Walker's propensity to commit crimes. See United States v. Taylor, 728 F.2d 864, 871 (7th Cir. 1984). In addition, the court instructed the jury not to consider evidence of any drug dealing, or use it as evidence that the defendant committed any of the charged crimes. Id. at 872.

### 3. Production of Agent Spotts's Notes of the Interview

Prior to trial, Walker moved to compel production of Agent Spotts's notes of their interview. After reading the notes and comparing them to the report, the court found the notes to be cumulative of the report and denied the motion for production. This was not an abuse of discretion, especially when we consider that the defendant, who has now seen the notes, cannot point to any inconsistencies. See United States v. Muhammad, 120 F.3d 688, 699 (7th Cir. 1997) (defendant is not entitled to an agent's notes if the report contains all that was in the notes).

### 4. Statement of Daniel Alvarez

Cook County Sheriff's Officer Gregory Wing interviewed the witnesses outside of the bank who saw the robbers escape in the getaway car. During the government's direct examination of Wing, Wing was asked whether one of the witnesses gave him the license plate number of the getaway car. He testified that he was given the number, and he was then allowed to read the number from his notes of the interview. On cross-examination, the

defense counsel wanted to elicit testimony from Wing that his notes also stated that one of the witnesses, Daniel Alvarez, saw one of the robbers flee the bank, pull out car keys and open the car door. (This was an attempt to show that there were only two people involved in the robbery.) The court refused to allow the testimony, finding Alvarez's statement to be inadmissible hearsay.

Although Wing was on the stand, his notes on Alvarez's statements were hearsay and Alvarez's statement in the notes was hearsay-within-hearsay. See United States v. Severson, 49 F.3d 268, 271-72 (7th Cir. 1995). (We note that the license plate information suffers from the same hearsay problems, but the admission of that information has not been challenged.) Walker offers no reason for admitting either layer of hearsay. He suggests, however, that since the notes were admitted to refresh Officer Wing's memory as to the license plate, Federal Rule of Evidence 106 required the court to admit the rest of the notes for the sake of completeness. But that rule does not help Walker here; it would only apply if he wanted the notes admitted to "explain or qualify the portion offered by the opponent" regarding the license plate number. See United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996). This was obviously not the use to which defense counsel intended to put it.

5.  List of "Charlie Browns"

At some point during the investigation, the Chicago Police Department compiled a list of names and addresses of six previous offenders with the alias "Charlie Brown." Walker asked that the list be admitted; the court found that the list itself was inadmissable hearsay but that the defense could elicit the information contained in the document through the testimony of the person who made the list.

Walker argues that the list was not hearsay because it was not being used for the truth of the matter asserted--i.e. to show that there were others with the same alias--but instead to show that the government did not follow all of the leads that it had. In other words, the government knew that there were other

offenders with the same alias but showed only Walker's photo to McLaurin. This in turn was supposed to suggest that it had rushed to point the finger at Walker, which might have undermined Agent Spotts's credibility.

Even if this theory avoids hearsay problems, it is highly speculative at best. Furthermore, the jury was told that there was a list and the court permitted defense counsel to ask Officer Wing about the substance of the list, i.e. that the investigators were aware that there were at least five other past offenders living in Chicago with the same nickname and they chose only one as a suspect. Only the actual piece of paper with the names on it was excluded. Any conceivable error in its exclusion was harmless.

6.  Photo Lineups

Following the robbery, five TCF bank employees viewed a photo lineup of six black males. The lineup did not include a photo of Walker, but it did include other men that the police thought might have been involved in the robbery. None of the employees positively identified any of the subjects as one of the robbers. Rather, they each offered opinions that certain subjects "had the same features" or "looked similar" to one of the robbers. Defense counsel wanted the photographs used in the lineups submitted as trial exhibits and wanted to elicit testimony from Agent Spotts that these witnesses had pointed to someone other than Walker as one of the robbers. The court refused to admit the photos.

This ruling was well within the court's discretion. The lineup and the resulting identifications were very confusing. Walker was not even included in the lineup; the police officers were trying to find out if anyone else was involved. The witnesses' testimony was exceedingly vague. Some witnesses identified only the person who stood in the lobby during the robbery, not the person who vaulted the counter. On top of that, defense counsel ultimately was able to tell the jury about these identifications. Agent Spotts testified that at least two witnesses pointed to someone other than Walker as having similar features to one of the robbers. Defense counsel was also allowed

to ask two testifying bank employees about their identifications. As the district judge noted, defense counsel could have called all of the TCF employees as trial witnesses if it wanted to elicit testimony about the rest of the identifications.

### 7. Spotts in Courtroom

Walker also complains about the fact that Agent Spotts remained in the courtroom throughout the trial. He waived this objection, however, when defense counsel affirmatively joined in the motion to allow Spotts to be in the courtroom during the trial. United States v. Davis, 121 F.3d 335, 337-38 (7th Cir. 1997). There is thus no occasion for us to address it further.

## III

As we said at the outset, the most difficult issue in this case concerns the confession that Walker gave while he was still suffering the symptoms of heroin withdrawal. The district court's factual findings about his condition, however, and the court's conclusion that he was able to make an informed and voluntary decision to confess, resolve that point against him. Whatever flaws may have existed in the remainder of the trial do not require reversal. We therefore AFFIRM the district court's judgment.