**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John F. KILGROE, Defendant–
Appellant,**

and

**Jesse Ridings, Defendant.**

No. 90–50542.

United States Court of Appeals,
Ninth Circuit.

Submitted March 3, 1992.*

Decided March 24, 1992.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Steven J. Katzman, Special Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before: CANBY, KOZINSKI and FERNANDEZ, Circuit Judges.

KOZINSKI, Circuit Judge.

Appellant Kilgroe was subpoenaed to testify for the defense in a criminal trial. During the course of cross-examination he made several self-incriminating statements that were later used by the government to convict Kilgroe of fraud. The question presented is whether Kilgroe was entitled to have the court or the prosecutor read him *Miranda* warnings before he took the stand for the defense.

### Facts

Kilgroe, in-house counsel for National Business Printers, was subpoenaed to testify for the defense in the criminal mail fraud prosecution of Albert Clark, another employee of National. Kilgroe testified that in his capacity as National's counsel he had repeatedly advised defendant Clark that his telemarketing program was neither fraudulent nor illegal. On cross-examination, the Assistant United States Attorney sought to impeach Kilgroe by getting him to admit that he was a participant in the mail fraud scheme, not just a disinterested attorney giving legal advice to Clark. Sure enough, Kilgroe made several incriminating statements disclosing his in-depth involvement in the mail fraud scheme. Defendant Clark was convicted.

Not long thereafter, events turned from bad to worse: Relying on Kilgroe's incriminating testimony in the Clark trial, the United States Attorney charged him with mail fraud. At trial, the district court admitted, over defense objection, a redacted version of Kilgroe's testimony in the Clark case. The jury convicted Kilgroe for mail fraud and he was sentenced to thirty months' imprisonment.

Kilgroe's only contention is that before he testified in the Clark trial, either the

Errol H. Stambler, Los Angeles, Cal., for defendant-appellant.

prosecutor or the court was required, in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to inform him of his right against compelled self-incrimination and warn him that anything he said could be used to convict him.[1] He relies heavily on the fact that he was forced to testify under the weight of a subpoena and on his surmise that the prosecutor considered him a putative defendant at the time of the Clark trial.[2]

## Discussion

 "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984). Although "those types of situations" may vary, they all share two essential elements: "custody *and* official interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296–97, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (emphasis added); *see also McNeil v. Wisconsin*, — U.S. —, —, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991) ("*Miranda* ... established a number of prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation").[3] Thus, the scope of *Miranda* is not, and never has been, coextensive with the scope of the right against compelled self-incrimination. *See Murphy*, 465 U.S. at 429–34, 104 S.Ct. at 1143–46. *Miranda* only comes into play when government-generated coercion risks "undermin[ing] the individual's will to resist," thereby leading him to disclose information he would otherwise not voluntarily reveal. *Perkins*, 110 S.Ct. at 2397 (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624).

 Although the courtroom is the paradigmatic setting for invoking the right against compelled self-incrimination,[4] it is not the type of setting that would justify invoking *Miranda*'s prophylactic rule. The *Miranda* Court itself recognized that "the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." *Miranda*, 384 U.S. at 461, 86 S.Ct. at 1621. Nor does the "obligation to appear and testify truthfully" created by a subpoena "constitute compulsion to give incriminating testimony" of the sort that implicates *Miranda*'s policies. *United States v. Jenkins*, 785 F.2d 1387, 1393 (9th Cir.1986). Unlike custodial interrogation—which usually takes place without warning and, therefore, without the chance for re-

1. A violation of *Miranda* is one of only three exceptions to the general rule "that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984). The other two exceptions have no relevance to this controversy. *See id.* at 434–40, 104 S.Ct. at 1145–49.

2. "A putative defendant is one against whom the Government already possesses incriminating evidence at the time of his appearance before a tribunal, or upon whom the Government has focused as having committed a crime." *United States v. Anfield*, 539 F.2d 674, 676 n. 2 (9th Cir.1976).

3. Professor Kamisar explains the *Miranda* dilemma best: "It is the impact on the suspect of the *interplay* between police interrogation *and* police custody—each condition *reinforcing* the pressures and anxieties produced by the other— that, as the *Miranda* Court correctly discerned, makes 'custodial police interrogation' so coer-

cive. It is the *combination* of 'custody' and 'interrogation' that establishes the 'interrogation environment' that is 'at odds' with the privilege against self-incrimination and that calls for 'adequate protective devices.'" Kamisar, Miranda: *The Case, The Man, and The Players*, 82 Mich. L.Rev. 1074, 1077 (1984) (selectively quoting *Miranda*, 384 U.S. at 455–58, 86 S.Ct. at 1617–19).

4. Indeed, the clearest roots of the right against compelled self-incrimination stem from assertions of that right by witnesses in court, including Sir Edward Coke's argument that his client had a right against self-incrimination on the charge of unlawful carnal knowledge in the 1589 matrimonial case of *Collier v. Collier* and John Lilburne's refusal to incriminate himself before the Star Chamber during his 1637 sedition trial in England. L. Levy, *Origins of the Fifth Amendment* 221, 271–276 (1986). The philosophical foundations for the right probably originated in ancient Rome, J. Story, *Commentaries on the Constitution of the United States* 663 (Rotunda & Nowak ed. 1987), and were best developed by John Lambert, Sir Thomas More and Christopher St. Germain. L. Levy, at 3–5, 64–70.

flection or legal advice—the subpoena gives the witness the opportunity in advance to obtain whatever counsel he deems appropriate and carefully contemplate his testimony. He remains free, of course, to refuse to answer questions that would incriminate him.

■ Kilgroe's claim that he required special protection because he was a putative defendant subjected to high pressure cross-examination is without merit. Cross-examination by a prosecutor, conducted in public and in the presence of both judge and jury, is hardly tantamount to custodial questioning by the police. While it is no doubt a powerful tool, cross-examination lacks the elements of isolation and intimidation associated with custodial police interrogation. That Kilgroe may have been a putative defendant when he testified is beside the point: The *internal* knowledge of a government agent that a witness may have been involved in criminal activity generates no *external* coercion on the witness. *See Anfield*, 539 F.2d at 676–77 & n. 3; *see also United States v. Mandujano*, 425 U.S. 564, 579–80, 583, 96 S.Ct. 1768, 1778, 1779–80, 48 L.Ed.2d 212 (1976).

■ It is easy to think of *Miranda* as an expansive shelter against a citizen's ignorance of his constitutional rights—especially because for the past 25 years the *Miranda* warning "has been ingrained in the American public," Ceol, *'Right to Remain Silent,'* Wash. Times, June 13, 1991, at A3, and "become part of our common awareness." Caplan, *Questioning* Miranda, 38 Vand.L.Rev. 1417, 1418 (1985). But the *Miranda* litany is a palliative only against the unique pressures inherent in custodial interrogation. It is not a judicially crafted civics lesson, to be recited whenever someone might find it useful to hear. Thus, except in the context of custodial interrogation, *Miranda* leaves the responsibility for keeping a citizen informed of his constitutional rights with the preeminent guardian of those rights: the citizen himself.

Conclusion

The district court's judgment is AFFIRMED.