UNITED STATES of America, Appellant,

v.

Herman Joseph BYRAM, Jr.,
Defendant, Appellee.

No. 97–2273.

United States Court of Appeals,
First Circuit.

Heard March 4, 1998.

Decided May 20, 1998.

Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and James L. McCarthy, Assistant United States Attorney, were on brief for the United States.

Jeffrey M. Silverstein, by appointment of the court, with whom Billings & Silverstein was on brief for appellee.

Before BOUDIN, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

BOUDIN, Circuit Judge.

In June, 1997, Herman Byram, Jr., was indicted by a federal grand jury as a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(e). In the district court, Byram moved to suppress two state-

ments he had made: one while in police custody and the other comprising his later trial testimony in a state criminal case involving a different defendant. The district court granted the motion, and the government brought this interlocutory appeal under 18 U.S.C. § 3231.

The background facts, testified to at the suppression hearing, are virtually undisputed. On the evening of June 12, 1996, and into the early morning of the next day, Byram was at the house of his friend Donald Boyce. In the early morning of June 13, Sean Bither, another friend of Boyce, was fatally shot during a game of Russian Roulette. Boyce—who allegedly had helped hold the gun to Bither's head—was later indicted and convicted of murder in Maine state court.

On June 13th, 1996, Detective Sergeant Dennis Appleton was assigned to supervise the case, and he learned that someone named "Frenchie" had been a witness to the shooting. Some time later, Appleton discovered that "Frenchie" was Herman Byram and that at some point during the evening, Byram had loaded Boyce's gun. Byram was on probation at the time. After the shooting Byram did not report to his parole officer for several months, and could not be found by the police.

At some point in the months following the shooting, Appleton contacted Special Agent Kenneth MacMaster of the Maine State Police. MacMaster had been assigned to a federal task force. Appleton told MacMaster that the police were looking for Byram as a witness, and that Byram might be charged under federal law as a felon in possession of a weapon, based on Byram's loading of the gun on the night of Bither's murder. (Byram's explanation was that he had reloaded the gun twice in the hope that Boyce would use the ammunition harmlessly.)

On February 19, 1997, after a warrant had been issued for his arrest, Byram turned himself in to his parole officer. Byram was immediately jailed and, the next day, was taken to Caribou Superior Court for arraignment. Learning of Byram's arrest, Appleton sent Detective James Madore to the courthouse to interview Byram and serve him with a subpoena for Boyce's trial. Appleton told

Madore to ask not only about the murder, but also about Byram's handling of the gun; it is not clear whether Appleton told Madore about the possibility of a possession charge against Byram.

Madore interviewed Byram in a small conference room in the courthouse with no one else present, directing his main questioning to Bither's death. Byram explained that he was in the courthouse for a parole violation; Madore knew that this meant that Byram was a felon. At first, Byram was reluctant to talk, but he spoke readily after Madore told him that he was not "implicated in any of this." Madore did not read Byram his *Miranda* rights at any point in the interview.

After discussing Byram's presence in the Boyce house on the night of the murder, Madore turned to Byram's handling of the gun. Byram discussed the details, apparently with no reluctance. At the end of the interview, Madore handed Byram the subpoena, and Byram returned to the courthouse holding cell. Later that day, Byram was arraigned, pled guilty to a violation of the terms of his probation, and was sentenced to six months in prison. Madore reported on his interview to Appleton and filed a written report.

On March 4, 1997, Agent MacMaster reviewed that report, and around that time he again discussed the matter with Appleton. Knowing that Byram was to testify at Boyce's murder trial, the two men agreed to take no further action until then. Appleton also spoke to William Stokes, who was to prosecute Boyce in state court, about Byram's prospective testimony. They discussed whether to advise Byram of his rights, but Appleton left the final decision up to the prosecutor.

On March 25, 1997, Byram, still in jail, was brought under subpoena to testify at the Boyce trial in state court. Neither Stokes nor anyone else advised him of his right not to incriminate himself or suggested that he consult an attorney. Byram testified in detail not only to the events surrounding the murder, but also to his having twice loaded Boyce's gun earlier in the day. After the testimony Appleton once again contacted

MacMaster to report that Byram had incriminated himself on the stand.

A couple of months later MacMaster received the transcript of Byram's testimony, and reviewed it. On May 30, 1997, MacMaster himself interviewed Byram at the Aroostook County Jail. MacMaster began the interview by reading Byram his *Miranda* rights, but did not ask him any questions about his handling of the gun. About three weeks later, a federal grand jury indicted Byram on the charge of being a felon in possession because of his handling of the gun on the day of Bither's death.

Before trial, the district court held a hearing on Byram's motion to suppress his two statements. Byram testified and claimed to remember that he *had* been read his rights by Madore at the first interview. However, the government admitted that Madore's evidence would be to the contrary, and the government and the judge agreed that Madore's memory of the events was probably more accurate than Byram's. The court also heard testimony from Madore, Appleton and MacMaster and accepted a stipulation from the parties concerning Stokes's actions.

After hearing argument from the parties, the court ruled on the motion to suppress in open court. Preliminarily, the court found that Byram in fact had not been advised of his *Miranda* rights by Madore, and also that Appleton, Madore, and MacMaster had acted in good faith, properly giving the murder case priority over the possession charge. The court held that, at the February 1997 interview, Byram had been in custody for *Miranda* purposes.

In explaining the reasons for suppression, the judge first noted that he found the voluntariness of both Byram's statement to Madore and Byram's open court testimony "suspect," and went on to say, "I'm satisfied that the defendant was not advised of his rights at any time ... prior to those statements and that he should have been.... I'm not going to suggest at which stage or by whom." The court then concluded that Byram had been deprived of his due process rights, and granted the motion to suppress both statements. This appeal followed.

On appeal, the government has decided not to challenge the district court's exclusion of Byram's initial statement to Madore in the courthouse on February 20, 1997; but it vigorously objects to the exclusion of Byram's March 25, 1997, trial testimony. We consider in turn three possible grounds for exclusion of the trial testimony: that it was the "fruit" of an involuntary confession, that it was the result of outrageous police conduct that shocks the conscience, and that it was the fruit of the *Miranda* violation.

■ *Voluntariness.* The district court expressed doubt whether Byram's statements to Madore and his testimony in open court were "voluntary" but did not expressly decide the issue. If we shared serious doubts about the voluntariness of the statements, we would probably remand for further findings because involuntariness is the best-settled and narrowest ground on which this case could be decided; the *Miranda* fruits issue, as we will see, is unusually difficult. However, the voluntariness standard has been refined by the Supreme Court in a manner that makes a voluntariness claim too doubtful to warrant a remand, and we think it useful to explain why.

Historically, the requirement that admissible confessions be "voluntary" reflected a variety of values; these included deterring coercion, assuring reliability of confessions, and protecting the suspect's free choice whether to confess. Thus, at common law, confessions produced by promises not to prosecute or offers of leniency were often excluded as involuntary. *See* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.2, at 440 (1985). And early Supreme Court cases looked in the same direction. *E.g., Lisenba v. California,* 314 U.S. 219, 234, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

However, in recent years, the Supreme Court has confined the voluntariness concept by holding that only confessions procured by *coercive official tactics* should be excluded as involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). *See United States v. Santos,* 131 F.3d 16, 19 (1st Cir.1997); LaFave & Israel, *supra,* § 6.2 at 87 (Supp.1990). "Free choice" is no longer a touchstone; indeed, the

Supreme Court has ruled in *Connelly* that a volunteered confession was admissible even if the product of a psychosis that undermined the suspect's ability to make a free and rational choice.

Judging whether improper police coercion occurred depends on the circumstances, but despite the district court's reservations it would be difficult to describe Byram's statements as coerced under *Connelly*. At no point did the police threaten violence or serious retaliation if Byram refused to speak; the questioning was not prolonged; and the atmosphere at the February 1997 courthouse interview appears to have been benign. Indeed, Byram does not seriously argue that Madore coerced him during the interview. There is even less reason to regard Byram's later trial testimony as the result of coercion.

Byram's main claim throughout has been that he was tricked by Madore's assurance that he was not implicated in Bither's death, literally true so far as the murder charge was concerned but a *suggestio falsi* as pertains to a possible possession charge. Certainly some types of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate. *See Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). *See also Spano v. New York*, 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

But trickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (confession obtained by false statement that co-conspirator had confessed); *see also Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). *But see United States v. Rogers*, 906 F.2d 189, 192 (5th Cir.1990).

Given the narrowed definition of coercion in *Connelly*, it would be very hard to treat as coercion a false assurance to a suspect that he was not in danger of prosecution. (Of course, a false assurance might undercut the gist of a warning, raising questions whether *Miranda* had been satisfied; but that is a different problem that we need not address since no *Miranda* warnings at all were given here.) We conclude that under *Connelly* Byram's interview statement, like his trial testimony, would not be "involuntary" even if he were deceived, a legal conclusion that makes any remand pointless.

■ *Outrageous Misconduct.* Byram argues that regardless of coercion, the methods used to obtain his statements were so shocking to the conscience that they violated his rights to "substantive due process." The classic case is *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where retrieving evidence by pumping the suspect's stomach was regarded as so at odds with civilized values that the evidence had to be excluded. Since *Rochin*, courts have from time to time invoked this standard to exclude evidence, but normally with some caution and only in the most extreme of cases. *See, e.g., United States v. Fernandez–Caro*, 677 F.Supp. 893, 894–95 (S.D.Tex.1987); *cf. United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993) ("[T]he outrageous misconduct defense is almost never successful.").

Given the district court's finding of good faith, the police conduct cannot be described as shocking to the conscience or beyond the bounds of civilized behavior. The police were investigating a homicide and thought, correctly, that Byram was a helpful witness, not implicated in the murder. As to the possession charge, Appleton did not tell Madore to omit the *Miranda* warning during the interview; and Madore, although he should have known that Byram was a suspect, said that he was focusing on the murder (and the district court apparently believed him).

Further, the Supreme Court's tolerance of police guile in *Frazier* makes clear that the police can often mislead suspects, at least where coercion is not involved; thus, it is impossible to treat all such false statements as improper, let alone outrageous or uncivi-

lized. Police investigation can be a rough business, and untruths may sometimes be necessary to save a kidnap victim, retrieve a missing firearm, or for other reasons quite apart from the desire to solve a specific crime already committed. *See New York v. Quarles*, 467 U.S. 649, 656–57, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In this case, "facts more egregious than those presented here" would be required to "rise to a level of a due process violation." *Moran v. Burbine*, 475 U.S. 412, 432, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

■ *Miranda.* This brings us to the *Miranda* doctrine which, with certain exceptions, renders inadmissible statements obtained through custodial interrogation unless the police officer informed the suspect of his right to remain silent and to consult an attorney. *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Despite the government's reserved objection, we think that during the interview with Madore, Byram was unquestionably being subject to deliberate custodial interrogation.[1] *Garcia v. Singletary*, 13 F.3d 1487 (11th Cir.1994), involving an on-the-spot inquiry by a guard who saw a prisoner burning his mattress, is miles away from the present case.

■ But *Miranda* does not extend to Byram's trial testimony. He was brought from jail under subpoena, but the testimony was given in open court and involved none of the dangers of jail-cell interrogation that prompted *Miranda*. The Supreme Court has held that a grand jury witness is not entitled to a *Miranda* warning before testifying, *United States v. Mandujano*, 425 U.S. 564, 579, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality opinion), and it would hardly hold otherwise in the case of trial testimony, *see id.* at 582, 96 S.Ct. 1768. Judges often warn trial wit-

nesses, or even call in counsel, where a witness appears to be on the verge of incriminating himself, but this admirable practice is not commanded by the Constitution.

■ The question, then, is whether the earlier statements unlawfully obtained under *Miranda* tainted the court testimony. Where a confession is coerced, evidence derived directly from the confession can also be excluded as involuntary under a doctrine similar to the "fruit of the poisonous tree" doctrine. However, in *Oregon v. Elstad*, 470 U.S. 298, 309–10, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court flatly forbade automatic application of the fruits doctrine for *Miranda* violations. *Compare* 1 LaFave & Israel, *supra*, § 9.5, at 762 (discussing pre-*Elstad* decisions in lower courts).

Some circuits have taken the view that *Elstad* is the end of any use of the fruits doctrine based on a *Miranda* violation.[2] Yet *Elstad* itself involved what most people would regard as a highly "technical" violation of *Miranda*—a volunteered statement by the suspect in his own home before being taken to the police station. More importantly, the later statements made at the police station, held admissible in *Elstad*, were made *after* the conventional *Miranda* warnings were given. Thus, the Eighth Circuit suggested that *Elstad* may be confined to cases where the *Miranda* violation is merely technical. *United States v. Carter*, 884 F.2d 368, 373 (8th Cir.1989).[3]

■ Our own view, highly tentative in the absence of more guidance from the Supreme Court, is that *Elstad* would be hard to confine to technical violations; its language emphasizing the voluntariness test as the prime safeguard is too powerful for that. But by the same token we think that *Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation[4]—at least

1. Byram, already in custody, was taken to a separate room in the courthouse, left effectively in Madore's immediate control, and then questioned systematically about his role in a criminal episode.

2. *See, e.g., Tankleff v. Senkowski,* 135 F.3d 235, 245 (2d Cir.1998); *Winsett v. Washington,* 130 F.3d 269, 276 (7th Cir.1997); *United States v. Elie,* 111 F.3d 1135, 1141 (4th Cir.1997).

3. *Carter* was cited favorably in *United States v. McCurdy,* 40 F.3d 1111, 1117 (10th Cir.1994), and *United States v. Gale,* 952 F.2d 1412, 1417–18 (D.C.Cir.), *cert. denied,* 503 U.S. 923, 112 S.Ct. 1302, 117 L.Ed.2d 524 (1992).

4. *Compare United States v. Polanco,* 93 F.3d 555, 560 (9th Cir.)(stating that *Elstad*'s effect is to admit "the suspect's subsequent, Mirandized statement"), *cert. denied,* — U.S. —, 117 S.Ct.

where the *Miranda* violation is not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate *Miranda* warning.

This is very much a description of the present case. Here, in contrast to *Elstad*, the original *Miranda* violation was not technical. We accept that Madore questioned Byram in good faith and did not consciously aim at implicating him in a crime, yet by any objective test, the threat that Byram would be implicated in a possession charge was clear. *See Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Madore further assured Byram that he was not implicated in any of "this." Thus, Byram returned to jail likely believing that his statements did not put him in danger.

Byram remained in jail without ready access to legal counsel until called to testify under the subpoena that Madore had served on him. Then, with no new warning that he could remain silent or consult with a lawyer (again, in contrast to *Elstad*), Byram was deliberately asked questions by the prosecutor to elicit the same self-incriminating statements about possession that Madore had extracted. Byram's trial testimony was thus very much facilitated by the original *Miranda* violation, which was neither technical nor mitigated by an intervening warning.

Two members of the panel think that under all the circumstances, Byram's state trial testimony should be suppressed in the federal case as the product of a *Miranda* violation. The third member of the panel has doubts whether this is consistent with the literal language of *Elstad* but agrees that *Elstad* is distinguishable on its facts and that the Supreme Court was not laying down an iron rule debarring a "fruits" argument in all *Miranda* cases. All members of the panel agree that the events in this case are unusual and that *Elstad* discourages any promiscuous use of the fruits doctrine in ordinary *Miranda* cases.

405, 136 L.Ed.2d 319 (1996); *United States v. Cherry*, 794 F.2d 201, 204 (5th Cir.1986) (describing *Elstad* as holding that evidence derived

Accordingly, we conclude that both sets of statements—Byram's admissions to Madore and Byram's trial testimony in the *Boyce* case—should be suppressed, although our reasoning is somewhat different from that of the district court. The suppression order is therefore *affirmed.*

from *Miranda* violations is "not automatically" excluded "in some situations"), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).