**UNITED STATES of America,
Plaintiff,**

v.

**Tomas Melendez SANCHEZ,
Defendant.**

**No. CRIM. 98–129(SEC).**

United States District Court,
D. Puerto Rico.

July 20, 1999.

---

**43.** *United States v. Soto Beniquez,* Criminal No. 97–76.

Mark Iris, U.S. Attorney's Office District of P.R., San Juan, PR, for Plaintiffs.

Edgar R. Vega Pabón, San Juan, PR, for Defendants.

## ORDER

CASELLAS, District Judge.

Pending before the Court is a motion to suppress filed by defendant Tomás Meléndez Sánchez to suppress his testimony during a Court hearing on May 19,1998 (Docket # 41). Upon careful consideration of the parties' arguments and the applicable law, defendants' motion to suppress is **DENIED IN PART AND GRANTED IN PART.**

### Factual Background

On December 3, 1997, defendant Tomás Meléndez Sánchez ("Meléndez") appeared before a federal Grand Jury investigating the case of *United States v. José Ramos Cartagena,* Crim. No. 97–110(JAF). Prior to providing his testimony, the Assistant U.S. Attorney ("AUSA") placed Meléndez under oath and advised him of his duty to provide truthful testimony to the Grand Jury. AUSA Margaret Davis advised Meléndez that he had a right to an attorney, and informed him of the criminal consequences to which he could be exposed if he lied. Meléndez said he understood his rights and his obligation to tell the truth, and declined to request an attorney. In his Grand Jury testimony he implicated several individuals in the planning and execution of a Loomis Fargo robbery, to wit: Antonio Velázquez (a.k.a. "Cano Ingram"), Rodolfo Landa (a.k.a. "Rudy") and his brother "Landa", "Chaito", "Hochi", José the guard, and "Moncho."(Docket # 41, Exhibit I, Grand Jury Transcript, pp. 5–7, 9, 15, 18).

On March 28, 1998, Meléndez met with David Román, counsel for one of the people he had identified as conspirators in the robbery and provided a statement under penalty of perjury before a Notary Public. (Docket # 48, Opposition to Motion to Suppress, Appendix, Exhibit II, Meléndez Affidavit) In that statement, Meléndez referred to a taped conversation with David Román in which he retracted all his allegations regarding the involvement of the identified people in the truck robbery. Id., Exhibit II, p. 3. Pursuant to Meléndez's statement, Román and other counsel for the defendants in *United States v. José Ramos Cartagena* sought to dismiss the indictment.

On May 19, 1998, approximately five months after Meléndez testified before the Grand Jury, the Government issued a subpoena upon Meléndez to testify as a witness for the defense in the case of *United States v. José Ramos Cartagena.* Prior to his testimony, the Court discussed with prosecutors Timothy Faerber and Margaret Davis and defense counsel José F. Blanco, Richard Dansoh, Juan Acevedo, David Román, Ricardo Izurieta, Joseph Laws, Fernando Carlo and Luis Rivera Rodríguez about the scope of the question-

ing regarding the credibility of Meléndez's testimony before the Grand Jury on December 3, 1997.

After discussion of several discovery matters and the opening statements by the Government and defense counsel, counsel David Roman called Meléndez to the witness stand. It is crucial to point out that Meléndez appeared to testify on May 19, 1998 without an attorney. Furthermore, there is no evidence that the Court advised Meléndez about his right to an attorney, his right to avoid incriminating himself, and that anything Meléndez said during the hearing could later be used against him in future criminal proceedings. Additionally, neither the prosecutors or defense counsel informed the Court on the appropriateness of advising Meléndez of his Fifth Amendment rights. On direct examination by counsel Román, Meléndez retracted his previous testimony before the Grand Jury, in which he identified several individuals as conspirators in the Loomis Fargo robbery. In essence, he admitted that he lied before the Grand Jury because Agent Carlos Cintrón, who allegedly promised him $35,000 and an apartment, trained him to tell the Grand Jury a story which involved all the persons Meléndez identified at the Grand Jury proceeding on December 3, 1997. He testified that Agent Cintrón housed him in several hotels within Puerto Rico's metropolitan area, as Cintrón fed him an ongoing story-line about the alleged criminal activities of "Cano Ingram" and the other individuals identified by Meléndez. Despite his previous declarations at the start of the Grand Jury proceedings, Meléndez claimed he was never aware that he would testify under oath before a Grand Jury, and that if he had truly understood the gravity of the proceedings and the consequences arising from his testimony, he would never have agreed to testify as Cintrón allegedly ordered him to testify. (Docket # 41, Exhibit II, Hearing Transcript, pp. 19–34).

Meléndez reiterated his retractions and his motivations for lying before the Grand Jury upon questioning by defense counsel Carlo, Acevedo, Blanco and Rivera, as well as prosecutors Faerber and Davis. Id., Exhibits II, III. The questioning commenced on the morning of May 19 and continued throughout the afternoon. Id. Meléndez clearly incriminated himself again and again without having been advised of his Fifth Amendment rights. It was not until late in the afternoon of May 19, 1998, after Meléndez had made yet another damning confession of perjury, that AUSA Davis suggested to the Court to advise Meléndez of his Fifth Amendment rights. Id., Exhibit III, p.44, line 6 to p. 45, line 2.

After the Court advised Meléndez of his Fifth Amendment rights, Meléndez clearly waived his right to an attorney, stating: "Well, Your Honor, I understand that all I want is that the truth come out and that the truth be learned. And I see no reason—I don't understand that there is any reason for me to have an attorney next to me in order to do that." Id., Exhibit III, p. 46, lines 3–7. Meléndez then continued to testify and reiterate his previous declarations that he had lied before the Grand Jury. After Meléndez finished his testimony, Judge Fusté ordered his arrest and told the prosecutors to file a criminal complaint against him for obstruction of justice and perjury. Id., Exhibit III, p. 75.

**Analysis**

Defendant Meléndez seeks to suppress the testimony given by him under oath on May 19, 1998 before Judge Jose Antonio Fusté, since neither the Government nor the Court advised him of his *Miranda* rights, that is, that he had a right to an attorney, that he did not have to incriminate himself, that anything that he would say during the hearing could be used against him in future proceedings, and that he could stop testifying at any time that he felt he could be incriminating himself. Accordingly, defendant claims that since the Government obtained Meléndez's incriminating statement without the proper *Miranda* warnings, the Court should

suppress the statements that led to the indictment as "fruits of the poisonous tree."

■ Defendant correctly argues that the Fifth Amendment protection against self-incrimination precludes the Government from using statements elicited from a suspect during a custodial interrogation if those statements were extracted without a prior warning. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990), *quoting Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. For the Fifth Amendment protection to come into play, however, the statements must be the result of a *custodial interrogation.*

■ A defendant is said to be in *custody* when he or she is either subjected to a formal arrest or restrained to the degree usually associated with a formal arrest. *United States v. Fernández Ventura,* 85 F.3d 708, 709 (1st Cir.1996), *quoting Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). To determine whether a particular restraint on freedom of movement meets this test, the Court "must examine all the circumstances surrounding the interrogation. This test is objective: the only relevant inquiry is 'how a reasonable [person] in the suspect's shoes would have understood this situation'." *Fernández Ventura,* 85 F.3d at 711, *quoting Stansbury,* 114 S.Ct. at 1529.

■ Among the factors which are usually taken into account in determining whether a defendant was in custody are: (a) whether he was questioned in a familiar or neutral surrounding; (b) the number of law enforcement agents that were present at the scene; (c) the degree of physical restraint which was placed upon the subject, i.e., whether the subject was free to leave; (d) and the duration and character of the interrogation. *Fernández Ventura,* 85 F.3d at 711, *quoting United States v. Masse,* 816 F.2d 805, 809 (1st Cir.1987).

■ A defendant is, on the other hand, said to be under *interrogation* when he or she is subjected to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Fernández Ventura,* 85 F.3d at 711, *quoting Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). As with the custody determination, the test is objective: the Court must determine whether a reasonable person would, given the same circumstances, perceive such questioning to constitute an attempt to elicit an incriminating response. *Fernández Ventura,* 85 F.3d at 711 (*quoting United States v. Taylor,* 985 F.2d 3, 7 (1st Cir.1993)).

### Custody

In the present case, the Government argues that Meléndez was not under custody, for purposes of Fifth Amendment analysis, since he came to the Court hearing of his own accord to testify on behalf of the defendants. According to the Government, Meléndez had met voluntarily with counsel for the defendants prior to the hearing, and provided them with a detailed sworn statement, acknowledging the consequences of perjury, and provided essentially the same declarations that he stated on open Court on the date of the hearing. Most importantly, the Government argues that "the fact that he had been subpoenaed by the Government for the hearing is not relevant because at no time had the defendant been placed under custody by the government." (Opposition, p.10)

■ We disagree. In order to determine whether Meléndez was under "custody" for purposes of Fifth Amendment analysis, we must examine (a) whether he was questioned in a familiar or neutral surrounding; (b) the number of law enforcement agents that were present at the scene; (c) the degree of physical restraint which was placed upon the subject, i.e.,

whether the subject was free to leave; and (d) the duration and character of the interrogation

### a) Familiarity of the surroundings

The Government argues that the defendant was no stranger to the legal system, since he had been arrested and charged on several occasions for multiple crimes, which included spousal abuse, aggravated theft and aggravated car theft. Additionally, he had previously testified before a federal Grand Jury. Accordingly, since he had previously been in similar courtroom settings, the defendant should not have felt an undue degree of uncertainty or fear toward his surroundings.

Although initially the Government's argument seems persuasive, a closer scrutiny reveals some flaws. Although defendant had a prior criminal history which required his attendance before a magistrate or judge, and some appearances in a courtroom, there is no evidence that Meléndez testified during any of those local criminal proceedings. Moreover, all the criminal proceedings took place in the courts of the Commonwealth of Puerto Rico, where the court officers, the prosecution and defense counsel presumably conducted their business in the Spanish language, which is Meléndez's native language. In the present case, Meléndez faced direct questioning from English-speaking attorneys and intensive cross-examination from an English-speaking prosecutor. Despite the benefit of a court interpreter and his previous courtroom experience, it is hard to fathom that Mélendez would not feel substantially more discomfort toward the foreign-sounding questioning than if he were in a court of the Commonwealth of Puerto Rico.

As for his Grand Jury testimony, his surroundings were substantially different from those in Judge Fusté's courtroom; at the Grand Jury inquest, Meléndez testified behind closed doors with only the Grand Jury members and prosecutor Maggie Davis. There was no cross-examining attorney, no judge or magistrate, and no public or press corps, as there were in Judge Fusté's public court proceeding on May 19, 1998. Accordingly, the Court finds that Meléndez was substantially unfamiliar with his surrounding during his questioning on May 19, 1998.

### b) Number of law enforcement agents present during questioning

The Court recognizes that the present case does not fit within the confines of the traditional "custodial interrogation" scenario. Accordingly, the number of law enforcement agents present during the questioning seems irrelevant in the present context. Nevertheless, insofar as this inquiry seeks to measure the degree of governmental coercion—or the potential exercise of such coercion—during Meléndez's questioning, we must make an educated guess. Given the presence of several defendants in the courtroom, and the need for security in the courtroom, it is likely that several U.S. Marshals were present during Meléndez's testimony. Additionally, one or more courtroom security officers were also present to preserve an orderly proceeding during the hearing. Finally, Assistant U.S. Attorneys Timothy Faerber and Margaret Davis must also be considered law enforcement officers, since they were the prosecutors who cross-examined Meléndez and led him to admit in open court that he lied before the Grand Jury, which served as the basis of Judge Fusté's order of arrest against Meléndez. (Docket # 41, Exhibit III, p.44, lines 6–21) Accordingly, we find that there was a substantial number of law enforcement officers during the questioning of Meléndez at the May 19 hearing, and such number contributed to the restrictive nature of the surroundings.

### c) Degree of physical restraint which was placed upon the subject, i.e., whether the subject was free to leave

We come to the most crucial element of the "custody" analysis: whether Meléndez

thought he was free to leave the courtroom and stop the questioning at any time. The Government cites a decision from the Second Circuit Court of Appeals, *U.S. v. Valdez*, 16 F.3d 1324 (2d Cir.1994) to support its contention that "a defendant who voluntarily appears before the Court to testify on behalf of his peers, cannot, later on, claim that he was under custody, subjected to interrogation, and entitled to *Miranda* warnings prior to his testimony." (Docket # 48, Opposition, p. 11)

We disagree. Meléndez attended the hearing of May 19 pursuant to a Government subpoena.(Docket # 41,Exhibit II, p. 73, lines 14–15) Although Meléndez may or may have not understood the full consequences of ignoring an official summons from the U.S. Attorney's Office to appear before a federal judge, it is reasonable to say that Meléndez, given his previous dealings with state and federal criminal authorities, felt compelled to comply with the Government's request. Furthermore, once he arrived at the Courthouse, the panoply of people, newspaper reporters and other members of the media, lawyers and prosecutors, must have created in Meléndez mind a claustrophobic, coercive environment from which he felt he could not extricate himself on a moment's notice.[1] (Docket # 41, Exhibit III, p. 50, lines 22–23). In fact, Ms. Davis's own statements to the Court during the hearing belie the Government's allegations that Meléndez's attendance and testimony was completely voluntary.:

> The Court: That's fine. For money you then lied?
>
> The Witness: Yes.
>
> The Court: For money you obstructed justice?
>
> The Witness: Yes.
>
> Ms. Davis: Before he answers that, will the Court instruct him as to his rights?
>
> The Court: He's voluntary.
>
> Ms. Davis: He's here under subpoena.
>
> The Court: Is he?
>
> Ms. Davis: Yes, Your Honor.

Docket # 41, Exhibit III, p. 44, line 18 to p. 45, line 2.

### d) Duration and character of the interrogation

With regards to the fourth element to determine whether Meléndez was subject to custodial interrogation, it is unequivocally clear that the questions posed by prosecutor Davis, as well as by the Court, elicited an incriminating response. Notwithstanding Meléndez's subsequent waiver of his *Miranda* rights after the Court advised him of such rights, this Court believes that defendant Meléndez may have hesitated to answer the prosecutor and the Court's questions if he had been given a proper *Miranda* warning at the start of

---

1. Meléndez's testimony on his apprehension during his Grand Jury testimony offers a window into his later mental state during the May 19 hearing:

> The Court: You were aware of this when you went to the grand jury and took your oath?
> The Witness: Yes. But it was when I got there, Your Honor. When I walked through the door, Your Honor—and God knows I'm telling the truth about this. It was when I got through the door that I learned that I was going to be testifying under oath. And by then, I had no way out. If I could have backed out of it, I would have backed out of it. But nobody gave me an opportunity to back out of it. If they had, I would have.

(Docket # 41, Exhibit III, p. 44, lines 8–16.)

The Government argues that defendant did not have the same degree of trepidation towards the May 19 hearing, since he came to redeem himself and purge his conscience. Furthermore, he testified without regard to any potential incarceration as a consequence of his testimony: "Yes, sir, definitely. And in fact, if I have to go to pay in jail for any damage I have done, I am willing to do so." Id., Exhibit II, p. 47. Notwithstanding Meléndez's seeming acceptance of the consequences of his testimony, we do not agree that such assertions undermine our finding that he was under "custody" at the hearing. Indeed, the dictates of his conscience, combined with the compelling power of the subpoena, may have led Mélendez to believe that he had "no way out" from attending and incriminating himself at the May 19 hearing.

the hearing.[2] Furthermore, the day-long questioning also raises a strong inference of custodial interrogation.

The Government also argues that Meléndez waived his *Miranda* rights at the May 19 hearing after he waived them during his Grand Jury testimony. In other words, the Government pretends to transfer Meléndez's Grand Jury waiver to the May 19 proceedings. The Court will not adopt this "transferred waiver" doctrine. Defendant must make a clear, intelligent, knowing and voluntary waiver at each separate legal proceeding. Furthermore, Meléndez could not waive his *Miranda* rights at the May 19 hearing until he was properly apprised and advised about the nature of those rights.

Pursuant to the analysis above, we hold that the questioning of Meléndez on May 19, 1998 regarding the credibility of his Grand Jury testimony constituted "custodial interrogation," as defined by Fifth Amendment case law. Accordingly, we hold that any incriminating statements regarding Tomas Meléndez Sánchez's Grand Jury testimony proffered by Meléndez prior to the Court's advice on his *Miranda* rights must be **suppressed.** We decline to suppress the statements made by Meléndez after the Court advised him of his Fifth Amendment rights, since he made an express and unequivocal waiver of those rights in open court. Defendant's motion to suppress is **DENIED IN PART AND GRANTED IN PART.** (Docket # 41)

**SO ORDERED.**

---

2. Meléndez's subsequent waiver after the eventual reading of his *Miranda* rights may have been a result of "the cat's out of the bag" syndrome. The Court believes that Me- léndez may not have waived his *Miranda* rights so readily if he had been advised of his rights at the beginning of the hearing.