# United States Court of Appeals
## For the First Circuit

No. 99-2089

UNITED STATES OF AMERICA,

Appellant,

v.

TOMAS MELENDEZ, A/K/A TOMAS MELENDEZ SANCHEZ,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Stahl, Circuit Judge.

Daniel S. Goodman, Appellate Section, Criminal Division, United States Dep't of Justice, with whom Guillermo Gil, United States Attorney, and Aixa Maldonado-Quinones, Assistant United States Attorney, were on brief, for appellant.
Edgar R. Vega-Pabon, by appointment of the court, for appellee.

**SELYA, Circuit Judge.** This appeal poses a single question: Do the safeguards demanded by Miranda v. Arizona, 384 U.S. 436 (1966), apply to testimony given by a subpoenaed witness in a criminal proceeding? The district court answered this query in the affirmative and suppressed certain inculpatory statements made by Tomás Meléndez Sánchez (Meléndez) on the ground that Meléndez had not been informed of his Miranda rights before he testified. See United States v. Sánchez, 59 F. Supp. 2d 348, 354 (D.P.R. 1999).[1] Concluding, as we do, that Miranda does not apply to in-court testimony, we reverse.

## I. BACKGROUND

In December 1997, Meléndez appeared before a federal grand jury and testified under oath as to the involvement of several individuals in an armored car robbery. In response to this evidence, the grand jury returned a superseding indictment that re-charged the original suspects and added two new defendants. Meléndez thereafter experienced a change of heart:

---

[1]Due to a publisher's error, the lower court opinion has been reported as "United States v. Sánchez" rather than "United States v. Meléndez." To avoid further confusion, we cite to it simply as "D. Ct. Op."

in March 1998, he met with counsel for one of the individuals he had implicated and retracted his allegations. The lawyer then moved to dismiss the charges against his client.

The case was set for trial on May 19, 1998. Prior to going forward, Judge Fusté held an evidentiary hearing to consider the motion to dismiss. The defense called Meléndez (who had been subpoenaed by the government to testify at the trial) as its only witness. Meléndez appeared without counsel. On direct examination by the moving defendant's attorney, he asserted that an FBI agent had supplied him with, and coached him on, the fabricated story that he had related to the grand jury.[2] On examination by a lawyer for a different defendant, Meléndez acknowledged dissembling to the grand jury. On cross-examination by an Assistant United States Attorney (AUSA), he reiterated and embellished upon these admissions.

Following an exchange with the AUSA in which Meléndez conceded that he had lied "for money," Judge Fusté warned him that anything he said could be used against him in a separate prosecution and also advised him that he was entitled to a lawyer then and there. Meléndez disclaimed any need for an

---

[2]The persons charged with having perpetrated the armored car robbery attempted to introduce Meléndez's tale at their trial. The district court excluded the proffer, and we upheld that ruling. See United States v. Mojica-Baez, ___ F.3d ___, ___ (1st Cir. 2000) [No. 98-2349, slip op. at 16-19].

attorney and continued to testify. When he finished, the court ordered his immediate arrest. An indictment for making false declarations in the course of a judicial proceeding followed apace. See 18 U.S.C. § 1623.

Transformed from a witness to a defendant, Meléndez invoked Miranda, the watershed case in which the Supreme Court held that a person undergoing custodial interrogation first must be told that he has the right to remain silent; that any statement he makes may be used as evidence against him; that he has a right to an attorney; and that if he cannot afford an attorney, one will be appointed for him. See 384 U.S. at 444. Noting that his testimony at the May 19 hearing had not been preceded by any warnings, Meléndez moved to bar the government from using it in the case against him.

His argument fell on sympathetic ears. Reasoning that the in-court questioning constituted custodial interrogation for which Miranda warnings were required, the district court suppressed all the statements that Meléndez had made prior to Judge Fusté's admonition concerning self-incrimination and the right to counsel. See D. Ct. Op., 59 F. Supp. 2d at 354. This interlocutory appeal followed. We have jurisdiction pursuant to 18 U.S.C. § 3731. See United States v. Flemmi, ___ F.3d ___, ___ (1st Cir. 2000) [No. 99-2292, slip op. at 8-11] (describing

-4-

scope and operation of statute allowing certain interlocutory appeals by the government in criminal cases); United States v. Brooks, 145 F.3d 446, 453-54 (1st Cir. 1998) (similar).

## II.  ANALYSIS

This appeal presents a pure question of law concerning the district court's application of the Miranda rule. Accordingly, we afford de novo review.  See United States v. Lewis, 40 F.3d 1325, 1332-33 (1st Cir. 1994).

Miranda established a bright-line rule making the warnings, enumerated above, conditions precedent to the admissibility of statements uttered by a suspect during the course of custodial interrogation.  See 384 U.S. at 444.  That rule is one of constitutional dimension.  See Dickerson v. United States, 120 S. Ct. 2326, 2333-34 (2000).  Withal, it applies only to custodial interrogations.  See Berkemer v. McCarty, 468 U.S. 420, 428-30 (1984); see also Dickerson, 120 S. Ct. at 2331; Miranda, 384 U.S. at 467.  This is as it should be: in a custodial interrogation, the police have the capacity to dominate the scene to such an extent that the risks of coercion and intimidation are unreasonably high.  The rule was devised to protect against the extraordinary danger of compelled self-

incrimination that is inherent in such situations. See Miranda, 384 U.S. at 455-56. Outside that narrow context, however, Miranda has no force. See Minnesota v. Murphy, 465 U.S. 420, 430 (1984).

Viewed against this backdrop, the threshold question here is whether the in-court questioning of Meléndez can be said to constitute custodial interrogation. The court below thought that it could. See D. Ct. Op., 59 F. Supp. 2d at 354. We do not agree. We set out below four reasons why we consider in-court testimony to be beyond Miranda's reach.

First and foremost, interrogation in a courtroom setting simply does not present the dangers that the Miranda Court sought to mitigate. The Court defined a custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a[] significant way." Miranda, 384 U.S. at 444. In framing this definition, the Court repeatedly emphasized that the safeguards it envisioned were designed to apply to self-incriminating statements obtained during "incommunicado interrogation of individuals in a police-dominated atmosphere." Id. at 445. The Court took pains to distinguish that sort of milieu from "courts or other official investigations, where there are often impartial observers to

-6-

guard against intimidation or trickery."  Id. at 461.  Although this was dictum, the Court hardly could have sent a clearer signal.

Moreover, the underlying distinction makes sense.  The dangers of coerced self-incrimination present in a police interrogation — a unique potential for the exertion of pressure, physical intimidation, psychological trickery, and prolonged grilling with no outside contact — are largely absent in a public courtroom.  As written, the Miranda rule balances the need to investigate and prosecute crimes against the imperatives of the Fifth Amendment.  See Michigan v. Tucker, 417 U.S. 433, 443 (1974).  To apply the rule willy-nilly to so different a situation would destroy this delicate balance.  We decline Meléndez's invitation to fish in such troubled waters.  See Berkemer, 468 U.S. at 437 ("Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.").

Our second reason for holding Miranda inapposite has its roots in this court's precedents.  We previously indicated that Miranda's safeguards do not extend to courtroom testimony.  In United States v. Byram, 145 F.3d 405 (1st Cir. 1998), we rejected the suggestion that a witness must receive Miranda

-7-

warnings prior to courtroom testimony to render that testimony admissible against him in a subsequent prosecution. See id. at 409. We observed that "the testimony was given in open court and involved none of the dangers of jail-cell interrogation that prompted Miranda." Id. Although our comments in Byram technically are dictum — we ultimately suppressed Byram's prior testimony on the unrelated ground that it had been tainted by an earlier statement obtained in violation of Miranda, see id. at 410 — they are considered dictum, and thus persuasive (even though not binding).[3]

Third, the case law in the other courts of appeals comports with our thinking. For example, in United States v. Valdez, 16 F.3d 1324 (2d Cir. 1994), the court held a witness's trial testimony admissible in a later perjury prosecution, even though the presiding judge (who delayed the execution of a warrant for the witness's arrest so that he could testify) had not warned the witness of the possible consequences of his testimony. See id. at 1330-32. Similarly, in United States v. Kilgroe, 959 F.2d 802 (9th Cir. 1992), a witness testified under subpoena, without Miranda warnings, and the government

_____

[3]The force of the Byram dictum is strengthened by our earlier decision in Labbe v. Berman, 621 F.2d 26 (1st Cir. 1980), in which we upheld the admission of a witness's inquest testimony at his subsequent trial, notwithstanding the absence of Miranda warnings. See id. at 29.

thereafter used the testimony against him in a subsequent prosecution. See id. at 803. The Ninth Circuit sanctioned the admissibility of the evidence, stating that "the courtroom . . . is not the type of setting that would justify invoking Miranda's prophylactic rule." Id. at 804 (footnote omitted).[4]

Last — but surely not least — the Supreme Court has refused to require that a grand jury witness receive Miranda-like warnings as a condition precedent to the use of his testimony against him in a later perjury prosecution.[5] See United States v. Mandujano, 425 U.S. 564, 580 (1976) (plurality opinion). In declining to require such warnings, the Court noted the many differences between custodial interrogation and other types of official investigations. See id. at 579-80. The year after it decided Mandujano, the Court held that a

---

[4]Interestingly, the Kilgroe court rejected an assertion that the subpoena served upon the witness-turned-defendant created a compulsion to give incriminating testimony, remarking that being subpoenaed gave the witness the opportunity to obtain counsel and left him free to refuse to answer questions that would incriminate him. See 959 F.2d at 804-05. We endorse this rationale, noting, inter alia, that the witness-turned-defendant in Byram also was under subpoena when he gave his original testimony. See 145 F.3d at 409.

[5]We say "Miranda-like" because the precise warnings required by Miranda are not fully transferable to the grand jury setting. In that milieu, a witness does not have "the right to remain silent," but can in fact be compelled to answer all but self-incriminating questions. See United States v. Washington, 431 U.S. 181, 183 n.2 (1977).

-9-

defendant's statements to a grand jury were admissible against her in a later perjury prosecution even though she had not been effectively warned of her Fifth Amendment right not to incriminate herself.  See United States v. Wong, 431 U.S. 174, 177-79 (1977).  The Byram court thought that the analogy between grand jury testimony and in-court testimony was compelling, see 145 F.3d at 409, and so do we.

In short, logic and an unbroken skein of authority — our own case law, cogent opinions from sister circuits, and analogous Supreme Court precedent — point unerringly to the conclusion that self-incriminating statements made by witnesses (whether or not subpoenaed) while testifying in judicial proceedings are admissible against them in later prosecutions, notwithstanding the absence of Miranda warnings.  We so hold.[6]

---

[6]In making a contrary determination, the court below relied on four factors that we have indicated should be taken into account in determining whether particular police questioning is custodial in nature.  See D. Ct. Op., 59 F. Supp. 2d at 351-54 (citing, inter alia, United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)).  These factors include the nature of the surroundings in which the suspect is questioned; the number of law enforcement officers present; the degree of physical restraint placed upon the subject; and the duration and character of the interrogation.  See id. at 351-52.  This put the cart before the horse.  Where, as here, questioning is done by lawyers in an open courtroom, the Ventura mode of analysis does not come into play.  Outside the context of custodial interrogation, the more relevant rule is that a witness must seize the initiative in claiming the privilege against self-inculpation — and this holds true even if he is confronted with queries that the government reasonably may expect will elicit

## III.  CONCLUSION

We need go no further.  Because we are convinced that the dangers that animated <u>Miranda</u> do not exist in situations involving in-court testimony, we rule that Meléndez's testimonial statements are admissible against him, notwithstanding the fact that he was not warned of his constitutional rights before he began to testify.  We therefore reverse the district court's contrary determination.  We add, however, that while <u>Miranda</u> warnings are not necessary to ensure that statements made by witnesses testifying in open court may be used against them in future prosecutions, it nonetheless may be salutary in a particular case for a judge to issue warnings, or even to appoint counsel, if a witness appears likely to incriminate herself.  Still, this practice entails certain risks, <u>see</u> <u>Valdez</u>, 16 F.3d at 1331, and we leave its employment to the sound discretion of the district courts.

**<u>Reversed</u>.**

---

incriminating answers.  <u>See</u> <u>Murphy</u>, 465 U.S. at 429.